## 11630

### JENKINS v. SOUTHERN RAILWAY CO. *ET AL.*

#### (125 S. E., 912)

1. Libel and Slander—Testimony of Bystanders as to Meaning Intended by Defendant in Making Alleged Slanderous Statements Held Admissible.—In action for malicious slander against railroad and agent, based on statements made by agent on his refusal to accept order for shipment of plaintiff's goods under name of and bond put up by another person, purporting to have been signed by plaintiff and such other person, on ground that other person's signature thereto did not appear to be genuine, testimony of bystanders that they understood from agent's language that he intended to charge plaintiff with having forged such other person's name, *held* admissible.

2. Corporations—Railroad Held Liable for Slander by Station Agent in Direct Course of Employment.—Railroad held liable for slanderous statements of station agent made on refusal to accept order purporting to have been signed by plaintiff and another person in whose name and under whose bond goods were to be shipped, imputing forgery by plaintiff of such other person's name, since in such case the slander, if committed, was committed by agent in direct course of employment.

3. Master and Servant—Master and Servant May be Joined as Defendants Under Allegation of Joint and Concurrent Tort.— Action against master upon his imputed liability for the negligence or willful act of his servant, committed within the course of his employment and against the servant upon his personal liability for the act, does not present a separable controversy, but the two may be united as defendants under an allegation of joint and concurrent tort.

---

Note: On liability of corporation for slander by an agent or employee, see notes in 9 L. R. A. (N. S.), 929; 21 L. R. A. (N. S), 873; L. R. A. 1916E, 774.

On personal liability of servant or agent for libel published while acting in the capacity of servant or agent, see note in 20 A. L. R., 116.

On right of jury to apportion or sever damages as between joint tortfeasors, see note in 30 A. L. R., 790.

4. TRIAL—RAILROAD JOINED WITH AGENT IN ACTION BASED ON AGENT'S REMARKS COULD NOT BE HELD LIABLE FOR GREATER AMOUNT THAN AGENT.—In action against railroad and against station agent for malicious slander, based on agent's statements made on refusal to accept order purporting to have been signed by plaintiff and other person, in whose name and under whose bond plaintiff's goods were to be shipped, imputing forgery of such other person's name thereto by plaintiff, railroad could not be held liable for greater amount than agent.

Before RICE, J., Barnwell, August, 1923. Reversed and remanded.

Action by B. M. Jenkins against the Southern Railway Co. and another. Judgment for plaintiff and defendant appeals.

*Messrs. Harley & Blatt,* for appellants, cite: *Identification of signature:* 37 S. C., 199. *Unbalanced verdict allowed to stand only where there was negligence of employees other than codefendant:* 111 S. C., 405; 119 S. C., 237.

*Messrs. Brown & Bush, R. C. Holman* and *Thos. M. Boulware,* for respondents, cite: *Construction placed upon words, by hearers, admissible in evidence:* 2 Rich. Law, 573. *Evidence, charge and verdict:* 16 S. C., 435; 89 S. C., 287; 111 S. C., 405.

December 13, 1924.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

Action for $20,000 damages on account of the alleged malicious slander of the plaintiff by the defendant Cooper, station agent of the defendant railway Company at Kline, S. C. Verdict in favor of the plaintiff for $2,000 against the railway company and $150 against the agent. Both defendants have appealed.

The circumstances out of which the alleged slander arose were as follows:

During the watermelon season of 1922 the railroad company refused to accept such shipments unless the freight

was prepaid, or a bond put up by the consignor for the freight. The plaintiff had a shipment to make, but was not prepared to prepay the freight, and had no bond up with the agent at Kline, S. C. He had made arrangements with one Rizer to make shipment under his name and under the bond which Rizer had put, up. Accordingly the agent prepared an order for Rizer to sign, authorizing this arrangement. The plaintiff had Rizer to sign it in the presence of a witness, Brabham, and presented it to the agent. It appeared from the testimony that the order was signed and witnessed by plaintiff and Brabham, on the fender of an automobile, and on that account did not appear to the agent to be genuine. The agent then said to the plaintiff, in the presence of others, that neither signature was genuine; that they were both written by the same man; and that the handwriting was that of the plaintiff. The agent then refused to accept the order or to make the shipment. A wordy altercation ensued, the agent returning to his office for a pistol and the plaintiff retiring to his place of business for similar armament. The affair blew over, however, and this suit resulted in the nature of a safety valve.

At the close of the testimony the defendant company moved for a directed verdict in its favor, upon the ground that the agent was not, at the time of the alleged slander, acting within the course of his employment. The motion was refused.

After the rendition of the verdict, the defendants moved for a new trial upon the ground that the verdict was inconsistent, being $2,000 against the master and $150 against the servant, whose act was the basis of the cause of action. This motion was also refused.

During the trial certain witnesses were allowed to testify, over the objection of the defendants, that they understood from the language used by the agent that he intended to charge the plaintiff with having forged Rizer's name to the order.

The exceptions raise three questions:

1. Did the Circuit Judge commit error in allowing the testimony of bystanders that they understood from the language used by the agent that he intended to charge and did charge the plaintiff with having forged Rizer's name to the order?

As to the first question: In *Morgan v. Livingston,* 2 Rich., 573, quoted with approval in *Zimmerman v. McMakin,* 22 S. C., 372; 53 Am. Rep., 720, the Court said:

"It is not necessary that the words, in terms, should charge a larceny. If, taking them altogether, in their popular meaning, such is the necessary inference, then there is no doubt that they are actionable."

But, assuming that the words alleged to have been used by the agent are not upon their face actionable as charging directly or by necessary inference the crime of forgery, in the case just cited it is held that, if the meaning of the words used be doubtful and ambiguous, the plaintiff has the right to inquire of bystanders how they understood them, quoting the following from *Davis v. Johnston,* 2 Bailey, 579:

"The rule in verbal slander, as to the construction of words, is, that they are to be understood in their ordinary and popular meaning. If words are susceptible of two meanings, one imputing a crime, and the other innocence, the latter is not to be adopted, and the other rejected, as a matter of course. In such a case, it must be left to the jury to decide in what sense the defendant used them. Their conclusion must be formed from the whole of the circumstances attending the publication, including the sense in which the witnesses understood the words."

See, also, *Hubbard v. Furman,* 76 S. C., 510; 57 S. E., 478.

As to the second question: It appears beyond controversy that the alleged slander, if committed, was committed by the agent in the direct course of his

employment. The question is concluded by the cases of *Nunnamaker v. Smith,* 96 S. C., 294; 80 S. E., 465. *Hypes v. R. Co.,* 82 S. C., 315; 64 S. E., 395; 21 L. R. A. (N. S.), 873; 17 Ann. Cas., 620. *Courtney v. Exp. Co.,* 120 S. C., 511; 113 S. E., 332; 24 A. L. R., 128. *Graham v. Ry. Co.,* 89 S. C., 1; 71 S. E., 235.

As to the third question: It is unquestionably settled by the decisions of this Court and the Supreme Court of the United States that an action against a master, upon his imputed liability for the negligence or willful act of his servant, committed within the course of his employment, and against the servant, upon his personal liability for the act, does not present a separable controversy, but that the two may be united as defendants under an allegation of joint and concurrent tort. *Chesapeake & O. R. Co., v. Dixon,* 179 U. S., 131; 21 S. Ct., 67; 45 L. Ed., 121. *Nunnamaker v. Smith,* 96 S. C., 294; 80 S. E., 465. *Schumpert v. R. Co.,* 65 S. C., 338; 43 S. E., 813; 95 Am. St. Rep., 802. *Carson v. R. Co.,* 68 S. C., 55; 46 S. E., 525, affirmed 194 U. S., 136; 24 S. Ct., 609; 48 L. Ed., 907. *Alabama R. Co. v. Thompson,* 200 U. S., 206; 26 S. Ct., 161; 50 L. Ed., 441; 4 Ann. Cas., 1147. *Cin. & T. P. R. Co. v. Bohon,* 200 U. S., 221; 26 S. Ct., 166; 50 L. Ed., 448; 4 Ann Cas., 1152.

The question is, does this situation present such a case as will authorize a verdict against the master for a certain amount and against the servant for a certain amount, in other words, a several verdict?

The overwhelming weight of authority sustains the proposition thus announced in the case of *Washington Gas Light Co. v. Lansden,* 172 U. .S, 534; 19 S. Ct., 296; 43 L. Ed., 543:

"The plaintiff in bringing his action saw fit to join the gas company and several of its officers as individual defendants. He could, had he so chosen, have brought his action

against the company alone.    All the defendants joined in
a plea of not guilty, and the jury could not find a verdict
of guilty against all, and apportion the damages among the
several defendants by giving a certain amount as against
the company and a certain other amount as against the in-
dividual defendants.    Those of the wrongdoers who are
sued together and found guilty in an action of tort are liable
for the whole injury to plaintiff, without examining the
question of the different degrees of culpability."

See, also, supporting this rule, *Cooley Torts,* 133, 135,
136.    *Currier v. Swan,* 63 Me., 323.    *Berry v. Fletcher,*
1 Dill, 67; Fed. Cas., No. 1357.    *Pardridge v. Brady,* 7
Ill. App., 639.    *McCarthy v. De Armit,* 99 Pa. 63.    *Mc-
Calla v. Shaw,* 72 Ga., 458.    *Hunter v. Wakefield,* 97 Ga.,
543; 25 S. E., 347; 54 Am. St. Rep., 438.    *Crawford v.
Morris,* 5 Grat. (Va.), 90.    *McCool v. Mahoney,* 54 Cal.,
491.    *Cole v. Roebling,* 156 Cal., 443; 105 P. 255.    *Lynch
v. Chicago,* 152 Ill. App., 160.    *Whitaker v. Tatem,* 48
Conn., 520.    *Layman v. Hendrix,* 1 Ala., 212.    *Glore v.
Aken,* 131 Ga., 481; 62 S. E., 580.    *Hall v. McClure,* 112
Kan., 752; 212 P., 875; 30 A. L. R., 782.    *Forseland v.
Swenson (Neb.),* 192 N. W., 649.    *United Workers v.
Coal Co.,* 258 F., 829; 169 C. C. A., 549.    *Lake Erie, etc.,
Co. v. Halleck,* 78 Ind. App., 495; 136 N. E., 39.    *Deputy
& Co. v. Hastings (Del. Super.),* 123 A., 33.    *Gonsalves
v. Baptiste (R. I.),* 122 A., 340.

In a very early case, however, in this State, *White v. Mc-
Neily,* 1 Bay, 11, decided in the Superior Court at George-
town, in April, 1784, it was decided that, where there were
joint trespassers, a jury may sever damages and apportion
them according to the degree and nature of the offense com-
mitted by each offender.    In a note to this case prepared in
1806 it is stated that the rule announced had been followed
up to that time, and "may be considered as a part of the
common law of South Carolina."

In the *Lansden Case, supra,* the Court, after announcing the rule, stated:

"The rule is different in South Carolina, where the jury can apportion the damages among the different defendants found guilty. It is acknowledged to be a departure from the rule at common law. *White v. McNeily* and others, 1 Bay, 10, 11."

The case of *White v. McNeily* was followed in a decision of the lower Court at Camden, also in April, 1784, *Whitaker v. English,* 1 Bay, 15, where it is said:

"Wherever men go to do an unlawful act of this kind, all and every of them are liable to the full extent; though where several are sued, a jury may apportion as they think just and proper."

In *Bevin v. Linguard,* 1 Brev., 503; 2 Am. Dec., 684, it was decided upon the authority of *White v. McNeily* that in an action against several defendants for a joint trespass the jury may apportion the damages according to the different degrees of guilt of the trespassers.

In *Smith v. Singleton,* 2 McMul., 184; 39 Am. Dec., 122, Judge O'Neall, referring to the order decisions, says:

"It is true, we early departed from the English rule that in a joint action of trespass the jury cannot sever in their damages. The case of *White v. McNeily,* in 1784, ruled that the jury in such a case might sever and apportion the damages according to the degree and nature of the offense committed by each defendant. The wisdom of such departure is, I think, very questionable; but it has been in prac- tice ever since conformed to."

The question incidentally was considered in the case of *Rhame v. Sumter,* 113 S. C., 151; 101 S. E., 832, where the city and a plumber were sued jointly for damages re- sulting from an automobile running into an open ditch in the street, left in that condition by the plumber. The city was sought to be held liable for a breach of its duty to keep

the street in repair, and the plumber for his personal negligence. The jury found a verdict of $425 against the city, and a like amount against the plumber. It was conceded by the appellants that the jury could, under the *White v. McNeily Case,* apportion the damages, but the real contention in the case was whether the verdict meant $425 against each or both. The Court held that it was against each defendant for $425. In deciding the case, the Court held that the jury had the right to render the verdict as it was; the liability being divided between the defendants.

However much the departure from the rule of the common law may be regretted, it has been too firmly adhered to to be now abandoned. As the Court says in the case of *Bevin v. Linguard (supra)* :

"This appears to have been the practice in this country for a long time past; and it has not been found upon experience, productive of any mischief or inconvenience."

In view, however, of the almost solitary position of this Court upon the question, opposed as it is by the authority of the supreme tribunal of the nation, and by almost every other State Court (and criticized as it has been by the judges who felt imposed to follow it), the rule should be confined to the precise condition which gave it birth.

The facts in the *White v. McNeily Case* were these: McNeily, a Tory, who had joined the British army in 1780, with a party of marauders plundered the house of White, burnt it, and carried away his horses. He and two others of the party were afterwards sued by White for the trespass. The jury rendered a verdict of 400 pounds against McNeily, 200 against one of the other defendants, and 100 against the third. The Court declared that it was at first doubtful whether such a verdict was not a "deviation from the old common law rule of joint trespassers, who being all equally guilty in the eye of the law, it was supposed jury could not sever," but upon consideration the rule was adopted upon

the ground that "it would be the means of preventing a multiplicity of suits, and at the same time put it in the power of the jury to apportion at once the quantum of damages, agreeable to the   * * *  guilt of each trespasser."

It will be observed that in this case the three defendants were direct, active, personal participants in the outrage, and the opportunity of "making the punishment fit the crime" was the basis of the rule; McNeily receiving the greatest because doubtless of his leadership.   It was not a case in which a master was subjected to an imputed liability for the act of his servant, where the absence of the reason for the rule denies its application.

In the *Bevin v. Linguard Case, supra,* the defendants united personally in assaulting and beating the plaintiff in his dwelling house, and tearing down a part of the house, throwing about his goods, etc.   The plaintiff recovered a verdict for $500, to be paid so much by one defendant and so much by another; a case of actual tort-feasors, where the opportunity of mulcting each defendant in proportion to the extent and manner of his participation afforded the ground for the application of the rule.

In the *Smith v. Singleton Case* the defendant had committed an outrageous battery upon the plaintiff; one Robert being present actively aiding and abetting.   The plaintiff sued Robert separately, and recovered. He then sued Singleton, and he set up, as a defense, satisfaction of the judgment against Robert.   The Court sustained his defense and dismissed the bill.   We refer to that case simply as another instance of the recognition of the *White v. McNeily* rule, applying to active, personal participation.

In the *Rhame v. Sumter Case, supra,* the city was sought to be held liable on account of its breach of duty to keep the street safe; the plumber, an independent party, for his personal negligence in leaving the ditch open; an instance of joint and concurrent negligence, each participant being charged with a personal and distinct breach of duty.

In the case at bar there are several reasons why the rule announced in *White v. McNeily* should not be applied. In the first place, the liability of the railway company, for the alleged slander committed by its agent is not imposed upon it on account of any participation, authorization, or ratification by it in or of the servant's act; it is an imputed liability, upon the principle of *respondeat superior*. The master is held liable, not because he committed the act, for it is clear that he neither committed it, participated in, or ratified it; he is held liable, not negligent or willful, because the servant committed it while about the master's business. It seems clear that the reason which justifies the application of the rule of *White v. McNeily,* the opportunity of punishing each participant according to the degree and manner of his guilt, does not exist in a case of this kind, and can only exist in the case of an actual, personal, joint, tort-feasors, and not in a case where, if that relation does not exist, it is only constructive.

That the relation of a master and servant in a case like this does not constitute them joint wrongdoers, in the accepted meaning of the term, is manifest from this consideration. In *Brown v. Railroad Co.,* 111 S. C., 141; 96 S. E., 701, the familiar principle is announced that there is no contribution between two joint wrongdoers. In *Jones v. Railroad Co.,* 106 S. C., 20; 90 S. E., 183, it is declared: "The company's liability is predicated solely upon the conduct of its servants under the doctrine *respondeat superior;* and, under the facts and circumstances proved, if the company is liable to plaintiff, the servant or servants whose wrongful acts or omissions actually caused the injury are liable over to the company for the amount which it will be compelled to pay on account thereof," and in *Sparks v. Railroad Co.,* 109 S. C., 145; 95 S. E., 344: "Moreover, if Jones' (the servant's) wrongful acts had caused the injury, and the company had been made to pay damages therefor

under the doctrine of *respondeat superior,* the company would have had a right of action over against him, or, being a party to the action with the company, it would have had the right to compel him to pay the judgment"; entitling the master not simply to contribution,. but to reimbursement; from which it must irresistibly follow that, while the relation constitutes the master and servant joint tort-feasors to sustain the action as one not separable, it does not consituate them joint tort-feasors to the extent of the rule in *White v. McNeily.*

Another illogical and .unjust result must follow from the application of the rule to this case. It is held in the cases of *Sparks v. Railroad Co.,* 109 S. C., 145; 95 S. E., 344. *Jones v. Railroad Co.,* 106 S. C., 20; 90 S. E., 183. *Sparks v. Railroad Co.,* 104 S. C., 266; 88 S. E., 739, that if, in an action against the master and the servant jointly, the alleged liability of the master is based solely upon an alleged act of negligence on the part of the servant, and a verdict is rendered in favor of the servant and against the master, the judgment will be set aside as resting on a "baseless fabric." In the *Sparks Case,* 109 S. C., 145; 95 S. E., 344, the Court sustains this conclusion upon the ground that otherwise the master will be deprived of his right to be reimbursed by the servant for the damage he is called upon to pay on account of the servant's negligent act (see quotation above set forth), and they go on to say:

"But it is perfectly clear that the company will be deprived of that right if it can now be held liable for the acts of Jones after he had been discharged from liability in the same action with the company for the same wrong, for the judgment in his favor would bar an action of the company against him, or any attempt on the part of the company to compel him to pay the judgment obtained against it. * * * As between him and the company, it is *res adjudicata* that he has done no actionable wrong."

The difference between a judgment wholly in favor of the servant and one against him for a comparatively small amount is in degree only, the one being as fully *res judicata* as the other; hence, where the verdict is against the master for $2,000, and against the servant for $150, both based solely upon the negligent act of the servant, how is it possible for the master to exercise his right of reimbursement, with a verdict limiting the liability of the servant to $150, obstructing his path?

But it may be suggested that there was evidence in the case of the wealth of the railway company, and a larger verdict was justifiable against them for punitive damages than against the agent. There might be some force in this proposition, if there had appeared some act of the company willful in its nature and separate from the act of the agent. That which fixes liability, however, upon the railway company is the act of the servant, and any discrimination in his favor, in the amounts apportioned, could not possibly benefit him under the master's right to reimbursement, unless that right has been curtailed by the verdict; and, if so, the verdict cannot stand as one depriving the company of a valued right.

The questions of the character of the alleged slander as being within the rule applicable to qualified privilege, and the existence of malice in uttering them, have not been raised by the exceptions, and have not been considered, nor, if raised, whether such questions presented issues of fact for the jury.

The judgment of this Court is that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court for a new trial.

MR. JUSTICE MARION and MR. ACTING ASSOCIATE JUSTICE RUCKER concur.

MESSRS. JUSTICES WATTS and FRASER dissent.

MR. CHIEF JUSTICE GARY did not participate.

MR. ACTING ASSOCIATE JUSTICE E. M. RUCKER (concurring) : I concur with Mr. Justice Cothran's opinion upon the questions raised by the appeal.

There is another matter in the case not presented by the exceptions, but evidenced by the undisputed facts, that in my judgment should be passed upon.

In considering the question now being raised for the first time in this opinion, differing as it does from the points deemed necessary to be passed upon by the learned Judge, and also differing from the questions raised by the appellants' attorneys, and upon the advisability of now passing upon it, I find myself unhappily not in accord with the members of this Court. I apprehend that some grave difficulty has been overlooked by me in reaching my conclusions, but if it exist I have been unable to discover it, and I can but give expression to my understanding of the law.

Nowhere in the case was the law of privileged coommunications either charged by the Judge or, so far as the record shows, called to his attention. The case was apparently tried upon the theory that the words were actionable and were not privileged.

In the first place, it is well to note that there is a distinction between written and oral scandal. The first will lie for words that hold one up to public shame and contumely; not so in the case of slander. In 1812, in the principal case of *Thorley v. Lord Kerry,* 4 Taunt., 355; 3 Camp., 214 (S. C., 13 R. R., 626), Lord Mansfield said the distinction had been recognized for over a century, having first been announced in the time of Charles II, and, whilst he was inclined to criticize the distinction, he said he was bound by the law as he found it and as it had been announced as representing the views of Lord Hardwicke, Hall, and Holt, C. J.

This distinction that an action may be maintained for words written, for which an action could not be maintained if they were merely spoken, has been recognized in prac-

tically all of the States and in this State in *Mayrant v. Richardson,* 1 Nott & McC., 347, 9 Am. Dec., 707.

The statements set out in the complaint even if they be regarded as amounting to slander, and upon that question I express no opinion, are clearly privileged. The Earle of Halsbury says:

"An occasion is privileged where the person who makes a communication has an interest or a duty (legal, moral or social, of perfect or imperfect obligation) to make it to the persons to whom he does make it; and the person to whom he does make it has a corresponding interest or duty to receive it." Volume 18, p. 686, § 1263.

And based his definition upon the leading cases of *Toogood v. Spyring* (1834) 1 Cr. M. & R., 181 where Parke, B., defined "a statement made on a privileged occasion as a statement made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." In *Harrison v. Bush* (1855) 5 E. & B., 344, the Court said:

"A communication *bona fide* made upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contains criminatory matter which without the privilege would be slanderous and actionable. 'Duty' * * * cannot be confined to legal duties, * * * but must include moral and social duties of imperfect obligation,"

—and in accord is Lord Esher's opinion in *Pullman v. Hill & Company* (1891) 1 Q. B., 524. The American authorities are to the same effect. *Briggs v. Garnett,* 111 Pa., 404; 2 A., 513; 56 Am. Rep., 274. *Montgomery v. Knox,* 20 Fla., 372. *Press Co. v..Stewart,* 119 Pa., 584; 14 A., 51. *Halstead v. Nelson,* 36 Hon (N. Y.) 149. *Van Wyck v. Aspinwall,* 17 N. Y., 190. *Brow v. Hathaway,* 13 Allen

(Mass.) 239. *Stallings v. Newman,* 26 Ala., 300; 62 Am. Dec., 723.

Nor is a privileged occasion destroyed by the fact that third persons happen to be present. "I am not aware that it was ever deemed essential to the protection of such communication that it should be made to some person interested in the inquiry alone and not in the presence of a third person. If made with honesty of purpose to a party who has an interest in the inquiry (and that has been very liberally construed), the simple fact that there has been some casual bystander cannot alter the nature of the transaction. The business of life could not well be carried on if such restraints were imposed on this and similar communications and if, on every occasion on which they were made, they were not protected unless strictly private. *Toogood v. Spyring, supra,* by Parke, B., and Lord Ellenborough in the case of *Dunman v. Bigg,* 1 Camp., 268, said: "The communications of business are not to be beset with actions of slander"; which were cited with approval by Lord Chief Justice Campbell in *Taylor v. Hawkins,* 16 Q. B., 308. And the tendency of all modern Courts is to widen the application of the rule, or at least to interpret it with an eye to the convenience and general welfare of society. A different situation would have been presented had the defendant sought the opportunity of making the statements in the presence of third persons.

Where a statement is a qualified privilege, there can be no recovery, unless malice is shown, and what do I mean by malice in this sense? If a man make a statement not on a privileged occasion, he is presumed to mean the legal effect of his words; and his is legal malice. But, where the occasion is a privileged one, as in this case, there must be proof of malice in fact. This was determined to be the law and the distinction between ordinary slander and slander under privilege as far back as the case of *Bromage et al. v. Prosser,* 4 Barn. & C., 247 (1825). *Beeler v. Jackson,* 64 Mr., 593;

2 A., 916. *Weatherston v. Hawkins,* 1 Term. R.,110. *Child v. Affleck,* 9 Barn. & C., 403.

In a case of absolute privilege, as for instance in Court proceedings, comments by the Judge, jury, witness, or counsel, no amount of malice in fact will render the libeler or slanderer liable. *Moore v. Mfg. Nat. Bank et al.,* 123 N. Y., 420; 25 N. E., 1048; 11 L. R. A., 753. *Keeley v. Great Northern Ry. Co.,* 156 Wis., 181; 145 N. W., 664; L. R. A., 1915C., 986.

It was necessary in this case, being one of qualified privilege, in order for the plaintiff to recover, to prove, not only that the statements of the agent were false, but that he was actuated by malice in fact. What does the record show? The defendant Cooper was the agent of the Southern Railway Company at the station of Kline. As such it was his duty to follow the rules established by the Southern Railway Company for the protection of its interest in the service of its patrons.

One of these rules was that in the shipping of watermelons the freight had to be paid in advance, or a bond, of course approved by the railway company, furnished for the payment of all freight charges. The plaintiff, not having the money to pay the freight on five carloads of watermelons, went to a Mr. Rizer, who had furnished a bond for a similar purpose, to get permission to use his bond for the purpose of covering the freight charges on his five cars of watermelons. Mr. Rizer was not in Kline, but was seen at Barnwell, where, in the presence of a witness, he affixed his signature to the paper authorizing such use of his bond. Late that evening, and only a few minutes before the time for closing the office, the plaintiff approached the defendant Cooper in front of the station, and there in the presence of others presented him this order signed by Rizer. The agent took the order, and, after taking a few steps toward the station, said to Jenkins: "I can't take this. That is not Rizer's signature." And when Jenkins insisted it was his

signature and had been witnessed the agent then said: "I don't believe that is the witness' signature," and, "I won't ship on that." It is to be noted that neither Rizer nor the witness Brabham were present. When a paper is presented purporting to be the order of another for permission to ship on his credit, the duty is incumbent upon the person presenting such an order of proving its genuineness.

The defendant Cooper owed a duty to the Southern Railway, and that was to protect the interest of the Southern Railway. As he had such a duty, his act became, and his words are understood, under the law of qualified privilege, and therefore could not be the subject of suit, unless made in actual malice. What evidence is there of malice? A paper is presented to him asking for credit under the bond of another which it was his duty then and there to accept or decline.

It makes no difference that in his arriving at a conclusion he made a mistake. He and the railway company would only become liable in the event that his decision was the result of malice in fact, and here is an absolute failure of any evidence whatever to show such malice. On the contrary, it affirmatively appears that the Southern Railway Company and the plaintiff were on good terms, if a corporation can be said to be on good terms with a person. It had extended to him credit. He had no cause of complaint against it. No feeling existed between him and the representatives of the railway company. It was the duty of the agent of the company to be sure that an order demanding a valuable right was a genuine order, and, if he fell into error, as he did, neither he nor the railway company are responsible.

Suppose a man presents a check at a bank made payable to his order, and the teller refuses to cash it unless he has himself identified it. Will that make the teller and the bank responsible in a suit for damages? Suppose a man presents a note to a bank with an endorsement on it, and the cashier

refuses to accept the indorsement, doubting the genuineness of the signature, does the cashier and the bank become liable in an action for damages for slander where such statement is made in the hearing of others who happen to be present on the theory that the refusal to accept it is in effect to charge him who presents it with the crime of forgery? Clearly not.

. In the ordinary conduct of affairs he who presents the signature of another should be prepared, if called upon, to prove its genuineness, and he who is to pass upon the genuineness of the signature does not render himself liable in an action for damages for the exercise of his honest judgment, whether he be right or wrong. The presence of malice must be shown. When the agent in this case made the statements alleged, he but discharged a duty. Immediately there-afterwards the plaintiff applied to him the vilest of all epithets. The defendant Cooper turned and walked into his office, where the plaintiff followed him, again applying the same epithet, and yet within a few minutes after this great indignity had been placed upon the defendant he had shipped several of the cars of watermelons, and the next morning completed it by shipping the balance. Does this show malice? He did not even show the very reasonable and natural resentment that an ordinary man situated as he was, undergoing what he had, would have shown. Is this Court without authority to correct this clear oversight? Has it no power beyond the passing upon of the questions raised by the appeal?

I am not unaware that this Court has said in a number of cases that only questions raised by exceptions will be finally passed upon by this Court. *Beasley v. Newell,* 40 S. C., 16; 18 S. E., 224. *State v. Robinson,* 40 S. C., 553; 18 S. E., 891. *Ramseur v. Moore,* 43 S. C., 304; 21 S. E., 81. *Aultman v. Salinas,* 44 S. C., 299; 22 S. E., 465. *Southern Ry. Co. v. Howell,* 89 S. C., 391; 71 S. E., 972, Ann. Cas., 1913A., 1070. *Stewart v. W. U. Tel. Co.,* 93 S. C., 119;

76 S. E., 111. *Watkins v. A. C. L. Ry. Co.,* 97 S. C., 148;
81 S. E., 426; and *Jefferson v. Southern Express Co.,* 103
S. C., 75; 87 S. E., 209. I apprehend that the rule had its
origin in the twofold purpose of giving notice to counsel of
the questions to be raised and the purpose of protecting the
Court for failure to pass upon a question not called to its
attention.

But in this case the question raised is not a collateral one,
nor is it one of subtlety; on the other hand, it is the very
gist of the case, and its being considered on appeal ought
not to be a surprise to counsel; and for the other purpose of
the rule I am not seeking protection for failure to pass upon
a question not called to my attention. On the other hand, I
am seeking to decide the question, on the answer to which the
substantial rights of the litigants rest, and I venture to think
it was never the intent by those decisions to limit the power
of this Court in the case of patent error disclosed by the
entire record.

In *Elliott v. Rhett,* 5 Rich., 405; 57 Am. Dec., 750, Judge
Wardlaw said the rule was for the attorneys and not for
the Court, a direction on the method of presenting cases,
rather than a limitation of the power of the Court itself.
However this may be, there is no reason why the Court
should abdicate its common-law right in a case where a plain
mistake has been made, which error is not before it by way
of exception, and, where on error found upon a ground duly
presented to the Court which necessitates the remanding of
the case for a new trial, to call to the attention of the trial
Court the law that should govern in the retrial of the case.
In the great case of *Hadley et al. v. Baxendale et al.,* 9 Exch.,
341; 23 Law J. Exch., 179, Alderson, B., said:

"We think that there ought to be a new trial in this case;
but in so doing we deem it to be expedient and necessary
to state explicitly the rule which the Judge at the next trial
ought, in our opinion, to direct the jury to be governed by
when they estimate the damages."

And I am of the opinion that this Court has authority, in a case where error is found upon exception taken which leads to a new trial, to call to the attention of the trial Judge errors found from which no exception was taken, with instruction to correct in the new trial. This is a practice that goes back far in the history of appellate Courts.

MR. JUSTICE WATTS (concurring and dissenting) : I concur in the opinion of Mr. Justice Cothran as to exceptions 1 and 2. The agent was acting in the scope of his authority, and his Honor was right in admitting the testimony of witnesses complained of as being erroneous.

It was for the jury to say whether the agent intended to charge the plaintiff with forgery and that plaintiff intended to cause shipment which was to be paid in cash or bond given by falsely pretending that he was to use Rizer's bond. I dissent from Justice Cothran's opinion as to exception 3, under the authorities quoted by Mr. Justice Cothran the law of this state has been contrary to rule as laid down in Justice Cothran's opinion, and I do not care what the law is in other tribunals; I feel bound to adhere to the law laid down by the decisions of this State.

The law has been laid down and followed by bench and bar for years, and I see no reason to depart from the decisions.

I think all exceptions should be overruled and judgment affirmed.