573 S.E.2d 830

**Marolyn L. BARIL, Appellant,**

v.

**AIKEN REGIONAL MEDICAL CENTERS, Respondent.**

**No. 3561.**

Court of Appeals of South Carolina.

Heard Oct. 8, 2002.
Decided Oct. 28, 2002.
Rehearing Denied Dec. 19, 2002.
Certiorari Denied April 24, 2003.

272

Herbert W. Louthian, Sr., and Deborah R.J. Shupe, both of Columbia, for appellant.

Richard J. Morgan and Reginald W. Belcher, both of Columbia, for respondent.

ANDERSON, J.:

Marolyn L. Baril appeals the Circuit Court's order granting summary judgment to Aiken Regional Medical Centers (Hospital) on Baril's action for breach of employment contract. We reverse and remand.

### *FACTS/PROCEDURAL BACKGROUND*

Baril joined Hospital's nursing staff in 1986. She earned a master's degree in nursing administration from the University of South Carolina in 1990. The following year, Baril was named director of Hospital's emergency department. Baril resigned from that position for personal reasons in 1992, but continued as a staff nurse in the emergency department. Holly Martinez de Andino eventually succeeded Baril as director of Hospital's emergency department. John Arnold [1] and Martinez de Andino indirectly supervised Baril.

In early 1993, Baril began teaching nursing classes on a part-time basis at the University of South Carolina's Aiken campus (USC Aiken). She joined the faculty on a full-time basis later that year.

Baril received an "Associate Handbook" from Hospital in May of 1997. She signed an acknowledgment form provided by Hospital, indicating she would familiarize herself with the handbook and that she understood the handbook "constitute[d] the personnel policies of [Hospital] and that [she was] governed by them." The handbook and acknowledgment form contained disclaimer language:

---

[1]. John Arnold's specific job title is unclear in the record, which indicates he operated in a supervisory capacity similar to that of Martinez de Andino.

**PLEASE READ!**

## Important Employment Information

The information contained in this booklet is designed to serve only as a reference to Aiken Regional Medical Centers policies and procedures. Aiken Regional Medical Centers reserves the right to amend this guide as necessary at any time, with or without prior notice. Current hospital policies and procedures will apply in all cases.

Please remember that **this booklet does not constitute a contract** between you and Aiken Regional Medical Centers. Employment at Aiken Regional Medical Centers is on a voluntary basis and **either you or the Facility may terminate this employment relationship at any time with or without reason or prior notice.**

No associate of Aiken Regional Medical Centers has the right to make verbal promises or commitments which may create a contract and thereby alter the **"employment at will"** relationship.

(Emphasis added). Additionally, the handbook's "Recruiting and Hiring" section included similar language:

In no event shall a hiring of an associate be considered as creating a contractual [re]lationship between the associate and the Facility; and, unless otherwise provided in writing, such **relationship shall be defined as "employment at will," where either party may dissolve the relationship.** (Emphasis added).

However, the acknowledgment form states that "the information in [the] handbook is subject to change/revision" and "any change will be communicated through the usual channels."

The handbook incorporated a detailed, progressive disciplinary procedure. Two categories of offenses were specifically identified. The categories were bifurcated: (1) actions meriting immediate termination; and (2) actions warranting termination for continuous violations.

In July of 1998, Martinez de Andino disciplined Baril for allegedly slamming a door in Arnold's face and disagreeing with Hospital's management regarding a management issue.[2]

---

**2.** Shortly before Martinez de Andino initiated the July 1998 disciplinary action against Baril, a dispute arose between them concerning Martinez

Baril was first suspended and later given a "final" written warning. Yet, the handbook's procedure mandated use of a "final" written warning only after two previous warnings. Baril had not previously been warned or disciplined.

Baril asked Hospital to change her work status from full-time to part-time in November 1998. She continued to teach full-time at USC Aiken.

Baril initiated a grievance pursuant to Hospital policy. Hospital's chief executive officer, Richard H. Satcher, investigated Baril's complaint and found sufficient cause to purge the disciplinary action from Baril's employment file. As a condition to purging her employment file, Satcher required Baril and Martinez de Andino to meet with Hospital's director of human resources, Richard Lowe, and director of nursing, Mary Ann Angle. The purpose of the meeting was to "clarify understandings and expectations" regarding Baril and Martinez de Andino's working relationship.

In January of 1999, Baril met with Martinez de Andino, Lowe, and Angle to discuss problems between Baril and Martinez de Andino. During the meeting, Baril expressed concern that Martinez de Andino had targeted Baril for termination which Martinez de Andino intended to accomplish using the disciplinary procedure. Lowe responded that Hospital had updated pertinent portions of its employee handbook to prevent the disciplinary procedure from being abused to eliminate employees and to ensure that it would only be used to positively impact its employees.

Lowe delivered a copy of the new policy to Baril. Regarding its purpose, the policy stated:

> To set standard operating procedures in order to ensure that all associates are **fully aware of the conduct expected of them.** This policy will also **ensure fair and consistent**

---

de Andino's decision to hire paramedics to perform nursing functions in the emergency room. Baril learned from the South Carolina Department of Health and Environmental Control that South Carolina law prohibited paramedics from performing some of the functions that Martinez de Andino intended for them to perform. Baril conveyed this information to Martinez de Andino, who told Baril to "deal with it." Baril contends Martinez de Andino resented Baril's input, leading to a souring of their relationship that motivated her to seek Baril's termination.

**treatment to associates** if violations of these standards of conduct occur.

**This policy is based on the concept of increased severity in disciplining associates** who repeatedly violate hospital rules while performing work for the hospital or while on hospital premises. Written counselings are given for initial, minor infractions of rules; if the infractions continue harsher discipline is enforced. However, **situations which are so serious that they require immediate stern disciplinary action will not follow a progressive concept.** [Hospital] reserves the right to administer disciplinary action as it deems appropriate for the circumstances involved.

(Emphasis added). The new policy provided: "Discipline is an instrument for changing unacceptable performance or behavior, and for providing motivation and encouragement for disciplined associates."

The new policy described four general categories of disciplinary offenses, ranging in degree of seriousness from greatest (critical offenses) to least (minor offenses). The category of "critical offenses" included actions that constituted "serious violations of rules or associate misconduct which justify immediate termination without regard to the associate's length of service or prior conduct." The new policy contained various examples of critical offenses. It specified in section 2.2.2 of HR116 that actions of "[d]ishonesty, fraud, theft (regardless of the amount), [or] unauthorized removal of hospital property" were examples of critical offenses.

At the end of the meeting, Baril and Martinez de Andino signed a document identifying "expectations" concerning Baril's and Hospital's obligations to each other. The details of the document consisted of expectations related to performance and communications.

On July 6, 1999, Baril suffered injuries when a cabinet fell on her while at work. She immediately sought treatment for injuries involving muscle strain, subperiosteal hematoma, and an impinged nerve. Baril filed an accident report and claim for Workers' Compensation benefits at the time of the accident.

Four days after her accident, on July 10, 1999, Baril traveled to Tacoma, Washington, for a vacation. When Baril

arrived, she received a telephone message indicating Hospital called her sister in an effort to contact Baril. In response, Baril called Hospital on its toll-free number and asked to speak to someone in her department. After a brief conversation with a coworker, Baril asked the coworker to transfer her call to her sister's home in Aiken. Baril informed her sister that she had arrived in Washington safely, and asked why Hospital wanted to talk to her. Baril's sister offered to call Hospital to ask why it had contacted her to try to reach Baril. However, Baril declined her sister's offer.

According to telephone company records, the call lasted thirty-two seconds. No evidence exists in the record concerning the cost of the call or whether Hospital sustained any economic loss as a result of the call.

Baril returned from vacation on July 17, 1999. When she reported to work the following day, Baril was told to meet with Arnold and Martinez de Andino. At the meeting, Baril learned that by using Hospital's toll-free number for personal use, she violated section 2.2.2 of Hospital Policy HR116, which cites "[d]ishonesty, fraud, theft (regardless of amount), unauthorized removal of hospital property," as "critical offenses" justifying immediate termination. Baril offered to pay for the telephone call, but Arnold refused to accept payment and informed her she was being terminated. Baril exited the premises a short time thereafter.

Baril filed this cause of action averring (1) Hospital created a contract of employment between Baril and itself through its written employee handbook, its amendments to the handbook, and its conduct regarding the handbook's policies, particularly the mandatory language of the disciplinary procedure in HR116 and verbal assurances provided by Lowe during the January 1999 meeting; (2) Hospital breached the contract between Baril and itself by wrongfully terminating her; and (3) Hospital violated S.C.Code Ann. § 41–1–80 (Supp.2001) by terminating Baril in retaliation for filing a Workers' Compensation claim. Baril sought $403,508 in actual damages, plus costs and other just and proper relief.

Hospital answered, generally denying Baril's allegations and claiming it "acted in good faith" when dealing with Baril's discipline and termination. Hospital specifically asserted that

Baril was an at-will employee throughout her employment with Hospital, and denied the existence of an employment contract. Hospital further claimed that, even if any employment contract existed, Hospital never breached it and that Baril's discharge was not wrongful. Hospital cited Baril's own conduct as the source of "any and all of the employment actions that [Hospital] took against [Baril]." Additionally, Hospital maintained that Baril "failed to meet [Hospital's] established work standards, stole [Hospital's] time and possibly money when making an impermissible telephone call, and violated at least one of [Hospital's] specific written Company policies for which [Hospital's] action was a stated remedy of the violation." Finally, Hospital contended Baril failed to mitigate any damages she might have sustained.

Hospital moved for summary judgment, arguing no material issues of fact existed and Hospital was entitled to judgment as a matter of law. The Circuit Court conducted a hearing on the motion and issued an order finding: (1) Hospital's policies did not constitute an implied employment contract as a matter of law, even when viewed in the light most favorable to Baril; (2) even if Hospital's policies constituted an implied employment contract, Hospital's actions did not breach the contract because it acted pursuant to the express terms of the alleged contract and because Baril's interpretation of the alleged contract was "strained and unreasonable and would have led to absurd consequences"; (3) Hospital did not breach any alleged contract because on the date Hospital terminated Baril it had a "reasonable, good faith belief that, pursuant to the language of HR 116, it had sufficient and just cause to terminate [Baril's] employment"; (4) Baril failed to establish a retaliation claim because she "based this cause of action merely upon her own self-serving, unsupported opinions and the temporal proximity between the filing of her workers' compensation claim and her termination of employment"; and (5) Baril failed to mitigate her damages because she "did nothing to seek employment or mitigate damages in any way." The Circuit Court dismissed all of Baril's claims with prejudice.

## STANDARD OF REVIEW

When reviewing the grant of a summary judgment motion, the appellate court applies the same standard which

governs the trial court under Rule 56(c), SCRCP: summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fleming v. Rose,* 350 S.C. 488, 567 S.E.2d 857 (2002); *Ferguson v. Charleston Lincoln Mercury, Inc.,* 349 S.C. 558, 564 S.E.2d 94 (2002). In determining whether any triable issue of fact exists, the evidence and all inferences which can reasonably be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Faile v. South Carolina Dep't of Juvenile Justice,* 350 S.C. 315, 566 S.E.2d 536 (2002); *McNair v. Rainsford,* 330 S.C. 332, 499 S.E.2d 488 (Ct.App.1998). If triable issues exist, those issues must go to the jury. *Young v. South Carolina Dep't of Corrections,* 333 S.C. 714, 511 S.E.2d 413 (Ct.App.1999).

■■■■ Summary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law. *Vermeer Carolina's, Inc. v. Wood/ Chuck Chipper Corp.,* 336 S.C. 53, 518 S.E.2d 301 (Ct.App. 1999). All ambiguities, conclusions, and inferences arising from the evidence must be construed most strongly against the moving party. *Bayle v. South Carolina Dep't of Transp.,* 344 S.C. 115, 542 S.E.2d 736 (Ct.App.2001). Even when there is no dispute as to evidentiary facts, but only as to the conclusions or inferences to be drawn from them, summary judgment should be denied. *Hall v. Fedor,* 349 S.C. 169, 561 S.E.2d 654 (Ct.App.2002). Moreover, summary judgment is a drastic remedy which should be cautiously invoked so no person will be improperly deprived of a trial of the disputed factual issues. *Lanham v. Blue Cross and Blue Shield,* 349 S.C. 356, 563 S.E.2d 331 (2002); *Trivelas v. South Carolina Dep't of Transp.,* 348 S.C. 125, 558 S.E.2d 271 (Ct.App.2001).

## *ISSUES*

I.  Did the Circuit Court err in granting summary judgment on the issue of whether Hospital's written policies and actual practices created an employment contract between the parties?

II. Did the Circuit Court err in granting summary judgment on the issue of whether Hospital's actions in

terminating Baril's employment breached a contract between the parties?

III. Did the Circuit Court err in granting summary judgment on the issue of whether Baril acted reasonably in attempting to mitigate her damages?

## *LAW/ANALYSIS*

### I. Existence of Employment Contract

■ Baril maintains the Circuit Court erred in granting summary judgment because, viewing the evidence in the light most favorable to Baril as the nonmoving party, material issues of fact exist concerning whether Hospital's written policies and actual practices created an employment contract between Baril and Hospital. We agree.

■ South Carolina recognizes the doctrine of employment at-will. *Prescott v. Farmers Tel. Coop., Inc.,* 335 S.C. 330, 516 S.E.2d 923 (1999). This doctrine provides that a contract for permanent employment is terminable at the pleasure of either party when unsupported by any consideration other than the employer's duty to provide compensation in exchange for the employee's duty to perform a service or obligation. *Id.* "At-will employment is generally terminable by either party at any time, for any reason or no reason at all." *Prescott,* 335 S.C. at 334, 516 S.E.2d at 925.

■ However, an employer and employee may contractually alter the general rule of employment at-will, thereby restricting the freedom of either party to terminate the employment relationship without incurring liability. *See Small v. Springs Indus., Inc.,* 292 S.C. 481, 357 S.E.2d 452 (1987). For example, an employee handbook may create a contract altering an at-will arrangement. *Id.*

■ Because an employee handbook may create an employment contract, the question of whether a contract exists is for a jury when its existence is questioned and the evidence is either conflicting or admits of more than one inference. *Conner v. City of Forest Acres,* 348 S.C. 454, 560 S.E.2d 606 (2002) (stating summary judgment is inappropriate in most instances when handbook contains both a disclaimer and promises). The presence of promissory language and a disclaimer in the

handbook make it ambiguous and subject to more than one interpretation.[3] *See Fleming v. Borden,* 316 S.C. 452, 450 S.E.2d 589 (1994) (stating that a handbook containing both a disclaimer and promissory language should be viewed as inherently ambiguous).

Here, the handbook states that it does not operate to change the at-will nature of employment to a contractual relationship. However, the handbook's procedures concerning progressive discipline, discharge, and grievance are couched in mandatory terms, including assurances that the procedures will be followed. As to Lowe's statements regarding the new disciplinary policy, Baril testified:

> Richard Lowe told me, guaranteed me that the new disciplinary policy was put into effect for exactly that reason because I told Richard, I said, you know, I have been a manager, and you can use a disciplinary procedure to try to eliminate people or try to help people grow and have positive behaviors and goals and grow.
>
> And Richard Lowe said that is what that policy is for, is to help you, and that is what is going to be happening from this point forward, and I felt that that was a guarantee, was a contract, a verbal contract that I would be treated equitably, that I would be—that I would not be targeted any further, that the grievance was over, and we were to go forward. And so I felt at that time that that was a contract that was made. . . .

Thus, the Hospital's procedures and practices give rise to more than one reasonable inference concerning the creation of an employment contract. Concomitantly, we find the trial court erred in granting summary judgment on the issue of whether Hospital's policies found in its employee handbook, amendments, and actual practices created an employment contract between Baril and Hospital.

## II. Hospital's Actions in Terminating Baril's Employment

■ Baril claims the Circuit Court erred in granting summary judgment because, viewing the evidence in the light most favorable to Baril as the nonmoving party, material

---

**3.** Baril and Hospital clearly disagree about the existence of a contract.

issues of fact exist regarding whether Hospital's actions in terminating her employment breached an employment contract between Hospital and Baril. We agree.

When an employment contract only permits termination for cause, the appropriate test on the issue of breach focuses on whether the employer had a **"reasonable good faith belief** that **sufficient cause** existed for termination." *Conner v. City of Forest Acres,* 348 S.C. 454, 464, 560 S.E.2d 606, 611 (2002) (emphasis added). "[T]he fact finder must not focus on whether the employee actually committed misconduct; instead, the focus must be on whether the employer reasonably determined it had cause to terminate." *Id.* at 464–65, 560 S.E.2d at 611.

### a. Reasonable Good Faith

In the January 1999 meeting, Baril expressed concern that Martinez de Andino disliked her and would use Hospital's disciplinary process to terminate her. Lowe responded that Hospital had updated pertinent portions of its employee handbook to prevent the disciplinary procedure from being abused to eliminate employees and to ensure that it would only be used to positively impact its employees. Nevertheless, reasonable minds could disagree as to whether Hospital proceeded to act in reasonable good faith by using the disciplinary policy to immediately terminate Baril for using the toll-free line to transfer one possibly business-related telephone call to Baril's sister for thirty-two seconds.

Additionally, our Supreme Court has held that summary judgment should not ordinarily be used to resolve the question of whether an employer acted under a reasonable good faith belief that sufficient cause existed for termination. *Conner,* 348 S.C. at 465, 560 S.E.2d at 611–612. Viewing the evidence in the light most favorable to Baril, we find that reasonable minds could differ as to whether Hospital acted with good faith in terminating Baril.

### b. Sufficient Cause

Hospital alleges it followed its disciplinary policies in terminating Baril. Hospital contends Baril's request that her call on Hospital's toll-free line be transferred to her sister's pri-

vate residence constituted an act of "dishonesty, fraud, theft (regardless of amount), unauthorized removal of hospital property." Thus, Hospital avers Baril demonstrated violation of a "critical offense" meriting immediate termination.

However, Hospital never announced a policy against use of its toll-free telephone line by employees for personal or private business, although the written materials of Hospital purported to communicate policies and changes to Hospital employees. Furthermore, Baril declared that other Hospital employees had engaged in similar behavior without Hospital's objection, thereby raising the possibility that Hospital tacitly condoned the practice. Assuming, arguendo, that Hospital rightfully concluded such employee use of its toll-free telephone lines for private purposes constituted dishonesty, fraud, or theft sufficient to merit immediate termination under its policy, evidence exists that Baril's telephone call to her sister originated in matters related to her employment at Hospital.

Moreover, Hospital failed to produce any evidence that it suffered a loss related to the telephone call. In addition, Hospital rejected Baril's good-faith efforts to compensate Hospital for any loss it may have sustained for the thirty-two second call, although Hospital's undisputed practice was to permit employees to reimburse it for private long-distance telephone calls.

The Circuit Court determined "no evidence showed or even suggested that [Baril] ever reimbursed or attempted to reimburse Hospital for any of these calls." A cursory reading of the record contradicts this finding. First, the phrase "any of these calls" wrongly implies that Baril made more than one call, contrary to undisputed evidence that she only made one call at issue. Next, the record is replete with testimony from Baril and Lowe that Baril immediately offered to reimburse Hospital for any expenses related to the telephone call.

Hospital maintains Baril abused her authority by ordering a subordinate to transfer the telephone call outside the Hospital. Yet, the record contains no evidence that Baril had any subordinates at the Hospital at the time she placed the call. In fact, the employee whom Baril asked to transfer the call was only considered a subordinate by the trial court because she had previously been one of Baril's nursing students.

Viewing the evidence in the light most favorable to Baril, we conclude her actions constituted a mere peccadillo at worst and that reasonable minds could differ concerning whether Hospital terminated Baril with just cause.

### III. Mitigation of Damages

Baril claims the Circuit Court erred in granting summary judgment because, viewing the evidence in the light most favorable to Baril as the nonmoving party, material issues of fact exist concerning whether she made reasonable efforts to mitigate her damages. We agree.

A party injured by the acts of another is required to do those things a person of ordinary prudence would do under the circumstances, but the law does not require him to exert himself unreasonably or incur substantial expense to avoid damages. *McClary v. Massey Ferguson, Inc.*, 291 S.C. 506, 354 S.E.2d 405 (Ct.App.1987). Whether the party acted reasonably to mitigate damages is ordinarily a question for the jury. *Id.*

Baril did not seek other employment throughout this litigation. However, she attempted to justify her behavior. First, she testified she did not want to reveal to potential employers that she had been fired. Second, she testified that there were no other hospitals with emergency rooms in or near Aiken, where she resided. Thus, she would have been forced to either commute or relocate in order to perform similar work. Baril did not want to relocate because she had a home and family in Aiken, where she taught college classes on a full-time basis. Baril speculated that a lengthy commute would interfere with her teaching career.

Considering the evidence in the light most favorable to Baril, reasonable minds could disagree over whether she made reasonable efforts to mitigate her damages. The trial court should have allowed this question to be resolved by a jury.

### CONCLUSION

Accordingly, the trial court's decision is
**REVERSED and REMANDED.**

CONNOR and STILWELL, JJ., concur.