605 S.E.2d 545

Herman LINGARD, Plaintiff,

v.

CAROLINA BY–PRODUCTS and Valley
Proteins Company, Defendants,

Randell Williams, Plaintiff,

v.

Carolina By–Products and Valley Proteins
Company, Defendants,

Of Whom Herman Lingard and Randell Williams
are, Appellants, and Carolina By–Products
is, Respondent.

No. 3880.

Court of Appeals of South Carolina.

Heard Oct. 13, 2004.
Decided Oct. 25, 2004.
Rehearing Denied Dec. 16, 2004.

Chalmers C. Johnson, of Charleston, for Appellants.

G. Dana Sinkler, of Charleston, for Respondent.

ANDERSON, J.:

Two truck drivers, Herman Lingard and Randell Williams, were terminated after they were discovered at home rather than on their routes. Lingard and Williams brought suit against their employer on the basis of the progressive disciplinary policy found in their employee handbook. The circuit court determined the handbook did not constitute a contract,

and even if it did, the employer fulfilled its obligations to the employees. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Herman Lingard and Randell Williams worked as truck drivers at the Branchville facility of Carolina By–Products, which is a division of Valley Proteins Company.

During their employment, Lingard and Williams received an employee handbook. They signed a written "Receipt of 'Employee Handbook,'" which stated:

> I . . . understand that I may terminate my employment at any time, with or without cause, and that the Company may terminate me at any time, with or without cause and without liability. I know my employment here does not constitute a contract of employment between the Company and myself and that this manual is not a contract of employment.

The handbook addressed company rules and created a progressive disciplinary procedure. Different classes of behavior would result in different responses from management. The most serious, Group I, could result in immediate discharge.

Lingard and Williams drove grease trap trucks that went to various restaurant locations in the lowcountry and off-loaded the used grease. This was a difficult and dirty position that frequently required fifteen-hour workdays. At the start of the day, the drivers were required to go to the Branchville facility where their trucks were located. Once there, they clocked in. Next, if the grease on their truck had not been off-loaded the night before, they had to off-load the grease. Then, the drivers performed a pre-trip procedure. This involved checking the truck to see if it was in good mechanical condition and inspecting the hoses on the truck. Finally, they scaled out, or weighed their truck, and left to begin their route. When the drivers scaled out, a ticket with a scale out time was generated. When the drivers returned after a day of work, they weighed their truck, which again generated a ticket with a time of weighing.

During the course of the day, Lingard and Williams were allowed a total of one hour in breaks—designed to be taken as a thirty minute lunch break and two fifteen minute breaks.

However, the drivers were not required to clock-out during these breaks or otherwise keep a record of the breaks taken.

Carolina By–Products was purchased by Valley Proteins. Subsequent to this sale, Richard Frank Miller became the general plant manager of the facility where Lingard and Williams worked. Melvin Mitchell served under Miller as Lingard and Williams' route supervisor. Because of a lack of productivity, a series of changes was made. These changes, including some impacting the drivers, did not lead to the desired increase in productivity.

Acting on a workplace rumor, Mitchell drove to the houses of Lingard and Williams during the morning on July 6, 2000. At approximately 6:45 a.m., the work trucks of both Lingard and Williams were parked in front of their houses. On this day, Lingard and Williams had weighed their trucks and left the Branchville location at 4:04 a.m. and 3:57 a.m., respectively. Mitchell did not immediately take action as he determined "[a]nything can happen once," and he wanted to give Lingard and Williams the benefit of the doubt.

On July 12, 2000, Mitchell and Miller drove to the houses of Lingard and Williams and again witnessed the work trucks parked at the employees' homes. Lingard and Williams had both clocked into work at 3:42 a.m. and weighed their trucks before leaving at 3:53 a.m. and 3:52 a.m., respectively. Mitchell and Miller photographed the trucks located in front of the houses of Lingard and Williams at 6:57 a.m. and 6:51 a.m., respectively. Mitchell testified he felt the power steering fluid reservoir on Williams' truck to determine how long it had been sitting there and, based on his experience with diesel trucks, determined because the reservoir was cool to the touch the truck had not been driven in an hour and forty minutes. He did not perform the same test on Lingard's truck because it was parked on Lingard's property and inaccessible.

On the afternoon of July 12, 2000, Lingard and Williams completed their routes and returned their trucks to the facility. Miller met with each separately and presented them with a notice of discharge. The notices were virtually identical, stating: "You are hereby discharged from Carolina By Products due to not following company rules Group I." The notices further explain, "[o]ur investigation showed the following: on

two occassion [sic] Carolinas By Product Truck . . . was sitting at your home. Not being at prescribe[d] location at time of incident. Giving false information." Neither Lingard nor Williams attempted to explain why they were at their houses rather than on their routes.

After their termination, both Lingard and Williams brought suit against Carolina By–Products and Valley Proteins Company for wrongful termination. The theory of the action was that the employee handbook created an employment contract, the employment contract included a progressive disciplinary policy, and their terminations violated that progressive disciplinary policy. The case went to trial. At the close of evidence, the circuit court granted a directed verdict. The directed verdict was based on the court's determination there was no employment contract, and even if a contract existed, the employer made a good faith decision it had grounds for termination.

## STANDARD OF REVIEW

"In ruling on motions for directed verdict and JNOV, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions and to deny the motions where either the evidence yields more than one inference or its inference is in doubt." *Jinks v. Richland County*, 355 S.C. 341, 345, 585 S.E.2d 281, 283 (2003). "The trial court can only be reversed by this Court when there is no evidence to support the ruling below." *Id.*

## LAW/ANALYSIS

■ Lingard and Williams present two arguments on appeal. First, the circuit court erred in concluding the employee handbook did not represent an employment contract. Second, the circuit court erred in concluding their termination did not violate the promises of a progressive disciplinary policy. We agree enough evidence was presented to normally require the existence of a contract to be a jury question. However, in this case, the circuit court correctly determined there was a reasonable good faith belief that sufficient cause existed for termination.

 South Carolina recognizes the doctrine of at-will employment. *Baril v. Aiken Reg'l Med. Ctrs.*, 352 S.C. 271, 573 S.E.2d 830 (Ct.App.2002). This doctrine provides that a contract for permanent employment is terminable at the pleasure of either party when unsupported by consideration other than the employer's duty to provide compensation in exchange for the employee's duty to perform a service or obligation. *Id.* However, in *Small v. Springs Indus., Inc.*, 292 S.C. 481, 357 S.E.2d 452 (1987), our supreme court recognized that statements in employee handbooks could be strictly enforced against employers as contractual obligations. *Id.* at 485, 357 S.E.2d at 454–55. A contract of employment created by an employee handbook is a unilateral contract. *See generally Miller v. Schmid Lab., Inc.*, 307 S.C. 140, 414 S.E.2d 126 (1992).

The *Small* decision seemed to suggest that a conspicuous disclaimer would prevent an alteration of the at-will employment status. *Small*, 292 S.C. at 485, 357 S.E.2d at 455. Yet, *Fleming v. Borden, Inc.*, 316 S.C. 452, 450 S.E.2d 589 (1994), involved a handbook that contained a disclaimer and a claim that it was inconspicuous. *Id.* at 460, 450 S.E.2d at 594. In *Fleming*, the supreme court did not simply determine the conspicuousness of the disclaimer, but stated:

> "[T]he disclaimer is merely one factor to consider in ascertaining whether the handbook as a whole conveys credible promises that should be enforced.... [T]he entire handbook, including any disclaimer, should be considered in determining whether the handbook gives rise to a promise, an expectation and a benefit."

*Id.* at 463–64, 450 S.E.2d at 596 (quoting Stephen F. Befort, *Employee Handbooks and the Legal Effect of Disclaimers*, 13 Industrial Relations L.J. 326, 375–76 (1991–92)).

 When looking at the handbook to determine to what degree it gives rise to a promise, an expectation, and a benefit, the court must focus on the actual language of the employee handbook. The court should consider whether the promises are couched in permissive or mandatory language. *See Conner v. City of Forest Acres*, 348 S.C. 454, 560 S.E.2d 606 (2002); *see also Jones v. General Elec. Co.*, 331 S.C. 351, 503 S.E.2d 173 (Ct.App.1998) (concerning a handbook containing

both mandatory and permissive language, thus creating a jury issue); *see generally* Note, *Conner v. City of Forest Acres: The End of the At-will Employment Era?,* 54 S.C. L.Rev. 1113, 1128 (2003).

Examples of mandatory language from *Conner* include: "(1) violations of the Code of Conduct '**will be** disciplined,' (2) 'discipline **shall be** of an increasingly progressive nature,' and (3) 'all employees **shall be** treated fairly and consistently in all matters related to their employment.'" *Conner,* 348 S.C. at 464 n. 4, 560 S.E.2d at 611 n. 4 (emphasis in original). *Horton v. Darby Elec. Co.,* 360 S.C. 58, 599 S.E.2d 456 (2004), is the most recent supreme court case to treat an employee handbook. Examples of permissive language in *Horton* are:

> (1) the disciplinary procedure "is to be viewed as the **guiding policy** insofar as taking disciplinary action . . .;" (2) "supervisors are **not required** to go through the entire three steps involved in this disciplinary procedure;" (3) "[d]iscipline **may** begin at any step in the procedure depending on the seriousness of the offense committed;" and (4) "supervisor **may** repeat any of the first two steps of this procedure when he feels it is necessary, so long as the discipline is commensurate with the offense committed."

*Id.* at 67 n. 7, 599 S.E.2d at 461 n. 7 (emphasis in original).

This evolution involving the effectiveness of disclaimers and the balancing of them against the actual language contained in the handbook was recently addressed by the General Assembly. On March 15, 2004, section 41-1-110 of the South Carolina Code was signed into law. This section states that a handbook shall not create an employment contract if it is conspicuously disclaimed.[1] However, this statute is inapplicable to the case at hand as it only applies to handbooks issued

---

1. Section 41-1-110 reads in full: "It is the public policy of this State that a handbook, personnel manual, policy, procedure, or other document issued by an employer or its agent after June 30, 2004, shall not create an express or implied contract of employment if it is conspicuously disclaimed. For purposes of this section, a disclaimer in a handbook or personnel manual must be in underlined capital letters on the first page of the document and signed by the employee. For all other documents referenced in this section, the disclaimer must be in underlined capital letters on the first page of the document. Whether or not a disclaimer is conspicuous is a question of law."

after June 30, 2004, and this employee handbook was issued to Lingard and Williams on January 21, 1999.

While Lingard and Williams signed papers acknowledging receipt of the handbooks, and that the handbooks do not constitute an employment contract, the handbook creates a progressive disciplinary policy that is couched in mandatory terms. The "Company Rules" section discusses four groups of behavior that can lead to varying degrees of punishment. The handbook states a violation of each group rule "will subject" the employee to certain levels of disciplinary action. For instance, a Group I violation "will subject an employee to disciplinary action ranging from a written reprimand to immediate discharge without any previous warning." "A violation of Group II rules will subject an employee to:

**Written Warning** Failure to Earn Attendance/Performance Bonus

**Second Offense** Up to and including Termination."

"A violation of Group III rules will subject an employee to:

**Written Warning** Failure to earn Attendance/Performance Bonus

**Second Offense** Suspension (2 working days)

**Third Offense** Up to and including Termination."

"A violation of Group IV rules will subject an employee to:

**First Three Offenses** Written warning and failure to earn attendance/performance bonus

**Fourth Offense** Final written warning and suspension (2 working days)

**Fifth Offense** Up to and including Termination."

The instant case is factually similar to this court's decision in *Baril v. Aiken Reg'l Med. Ctrs.*, 352 S.C. 271, 573 S.E.2d 830 (Ct.App.2002). In *Baril,* a handbook purported not to change the at-will employment status while simultaneously containing a progressive disciplinary policy couched in mandatory terms. *Id.* at 282, 573 S.E.2d at 837. Under those facts, this court determined the existence of an employment contract is a jury decision. While South Carolina jurisprudence has continued to grapple with the existence of employment contracts, this essential holding from *Baril* remains extant. When our courts have found progressive disciplinary policies

did not create a contract, those policies were couched in permissive rather than mandatory terms. For example, the *Horton* court articulated:

> The disciplinary policy in the manual provides:
>
> . . . .
>
> The following is to be viewed as the guiding policy insofar as taking disciplinary action for infractions of company rules and misconduct is concerned.
>
> 1. At first offense, if not in itself serious enough to warrant suspension or discharge, give warning and advise that another offense will result in suspension for 3 days without pay as a disciplinary measure.
>
> 2. At second offense, if not in itself serious enough to warrant discharge, give 3 days' suspension without pay and warn that another offense may result in discharge.
>
> 3. At third offense, discharge, and point out to employee that he brought the action on himself and left the supervisor without any alternative.
>
> . . . .
>
> It should be emphasized again that supervisors are not required to go through the entire three steps involved in this disciplinary procedure. Discipline may begin at any step in the procedure depending on the seriousness of the offense committed.
>
> . . . .
>
> Respondent's manual exemplifies the appropriate manner in which to give employees a guide regarding their employment without altering the at-will employment relationship. The manual contained conspicuous disclaimers and appellant understood those disclaimers. Further, the disciplinary procedure contained permissive language and did not provide for mandatory progressive discipline. Appellant, who himself had the responsibility of interpreting the manual, stated he interpreted the manual as not limiting his ability to terminate employees. Accordingly, the policy manual did not alter the employment at-will relationship between appellant and respondent.

*Horton,* 360 S.C. at 61–68, 599 S.E.2d at 457–61 (footnote omitted).

■ In the present case, the circuit court ruled that even if there was an employment contract, the employer did not violate the progressive disciplinary policy when it terminated Lingard and Williams. Lingard and Williams were terminated after an investigation revealed they had, on at least two occasions, spent time for which they were being compensated by the company at their homes rather than working their routes. Lingard and Williams attempt to argue the final incident was short in duration. However, the facts suggest otherwise. Their weigh-out tickets, which signify when they left the facility, were at 3:52 a.m. and 3:53 a.m. Both men testified they were at the facility longer because they had to prepare their trucks for the routes. Yet, this assertion is in direct contrast to the weigh-out tickets. Both men testified it took approximately thirty minutes to travel from the facility to their houses and they had traveled home to perform quick tasks before beginning their day's route. Lingard declared he stopped to make sandwiches to eat on the road. Williams averred he stopped to shower after performing the long and dirty task of cleaning his truck, an assertion that is debased by the fact that the time between which he clocked in and weighed out was thirty minutes. The testimony regarding a short stop is undercut by testimony and pictures of their trucks in front of their houses at 6:51 a.m. and 6:57 a.m. This leaves nearly three unaccounted hours.

While the mere testimony of the men regarding their departure times and quick stops, which could be accounted for by their permissible one hour breaks, would typically raise a jury issue, South Carolina law does not allow judges and juries to peer unchecked into employment decisions. In *Conner v. City of Forest Acres*, 348 S.C. 454, 560 S.E.2d 606 (2002), the supreme court focused on whether there was a reasonable good faith belief that sufficient cause existed for terminating Conner. The city terminated Conner, a grievance committee reinstated her, and the city council overturned the reinstatement. The court found reasonable minds could differ as to whether just cause existed to support Conner's termination and the circuit court should not have granted summary judgment.

· Recently, in *Horton v. Darby Electric Co.*, 360 S.C. 58, 599 S.E.2d 456 (2004), the supreme court found, unlike *Conner*,

reasonable minds could not differ as to whether just cause existed in support of Horton's termination and, therefore, summary judgment was appropriate. The *Horton* court explained that even if the handbook was interpreted as altering the at-will status, Horton's behavior and the evidence demonstrated a reasonable good faith belief that sufficient cause existed for termination. *Id.* at 68, 599 S.E.2d at 461.

While Group I behavior does not specifically list stealing from the employer by spending company time at home, it does enumerate theft, falsifying time cards, and giving false information to management. Time spent at home performing personal tasks is not time spent working. However, Lingard and Williams expected to be paid for this time. Lingard and Williams did not affirmatively report time at home to supervisors, instead letting their time cards stand uncorrected. Knowing that they were paid based on the times reported on their time cards, this was not only theft but also falsification of time cards. Furthermore, Lingard and Williams provided false information to management by representing themselves as working when they were not.

The discovery by Mitchell and Miller that Lingard and Williams were at home when they were supposed to be on their routes constitutes a good faith belief that the behavior of Lingard and Williams justified termination. Although Lingard and Williams attempt to portray their time spent at home as short and within their allowed breaks, the facts do not support this assertion. More importantly, the conclusions of Mitchell and Miller do not have to be uncontested fact, but must instead simply be supported by enough evidence to support their good faith belief in the cause for termination. The facts support this good faith belief that Lingard and Williams were staying at home when they should have been working. We conclude that classification of this behavior as Group I was made in good faith.

## CONCLUSION

For the reasons stated above, the directed verdict is
**AFFIRMED.**

GOOLSBY and WILLIAMS, JJ., concur.