656 S.E.2d 382

**Kim PARRISH, Appellant,**

v.

**Earl ALLISON, Respondent.**

No. 4322.

Court of Appeals of South Carolina.

Heard Nov. 14, 2007.

Decided Dec. 19, 2007.

310

312

J. Michael Turner, Sr., and Matthew P. Turner, of Laurens, for Appellant.

Frank L. Eppes and L. Lee Plumblee, of Greenville, for Respondent.

ANDERSON, J.

In this defamation action, Kim Parrish (Parrish) sued Earl Allison (Allison) for statements alleged to be slander *per se.* The trial court denied Parrish's motions for directed verdict and judgment notwithstanding the verdict. The jury returned a verdict for Allison. We affirm in part, reverse in part, and remand.

## *FACTUAL/PROCEDURAL BACKGROUND*

Appellant Parrish is the great-niece of Allison. Over the years, family disagreements have resulted in numerous insinuations and incidents by both sides. Frequently at issue was the family land which has been divided over time between Allison, Parrish, and others. The events leading to this defamation action arose when Parrish began efforts to have the county close a portion of road where her land is located. At a Laurens County Council (the Council) meeting, Parrish appeared and voiced her concerns regarding the safety of the road. Allison expressed his opposition at a subsequent council meeting where he made the statements at issue. Specifically,

Allison said Parrish had (a) "conned his mother [Parrish's great-grandmother] into signing her land over to [Parrish]," and (b) "conned [his mother] out of her insurance money."

Prior to the meetings, Parrish visited Allison at his home to discuss her intentions to ask the county to close the road. Although Allison initially told Parrish he was neutral, he later decided to oppose the closing. Allison's change in position was sparked by an article he read in the local newspaper. It reported that Parrish, at the first meeting, told the Council a man fell off a golf cart and was run over on the road. Allison knew this incident never happened. However, Parrish's testimony revealed her nephew fell off a go-cart in another locale and was run over leaving him with a lengthy recovery. The record established that the newspaper had misquoted Parrish. At trial, Parrish said she told the Council of her nephew's ordeal to illuminate the devastation of "freak accidents."

At the inception of the second county council meeting, an announcement was made clarifying the newspaper had reported incorrectly. Allison, advanced in years and hard of hearing, was present but testified repeatedly he did not hear the correction. He proceeded to make his statements believing Parrish had told a lie and the Council would rely on a fabrication in deciding whether to close the road. Allison made the following statements about Parrish: "She lied about different things.... [S]he lied about a man getting ran over."

I don't know why she is driving this so hard with lies to get it accomplished. [T]he point about the man getting run over on Allison Road is an absolute lie. This is the most outrageous thing I have ever heard. This should have been kicked out the first time she came in here with this big tale. We have had trouble with this woman ever since she has been living in Hickory Tavern. The things that she has done and gotten by with.... she got by with cutting Tony Lollis water line and blocking the road off. I want to tell you how kind-hearted she is. My mother lived to be an old, old woman. She *conned her into signing the whole place ... house, land and furniture, two insurance policies.* She did not show up at the funeral. She did not show up at the Mortuary and paid not one penny towards the funeral. The two insurance policies were for her funeral. She is a dangerous woman. (Emphasis supplied).

Allison does not deny making the statements though testimony is inconsistent as to whether he used "conned" to imply "stole" or "persuaded." In a deposition, Allison insisted on the truth of his statements and answered the questions of Parrish's attorney as follows:

Q: You wanted her to be known as a liar in the community?

A: Right.

Q: You wanted her to be known as someone who stole land from your mother?

A: Right. Exactly right.

But on direct examination by Parrish's attorney, Allison testified:

Q: Now, Mr. Allison, when you appeared before the Laurens County Council you could have spoken against the closing of Allison Road without personally attacking Kim Parrish, couldn't you?

A: Say I could have?

Q: Yes, sir.

A: Well, I wanted to get the point across, I wanted her character revealed and I wanted to let the county council know what we were dealing with.

Q: You turned this into a personal attack on Kim Parrish?

A: No, no, no. I have no personal attack on Kim. I am glad to see Kim progress, the way they are progressing. I don't hate my own, I don't mean to hate you and I don't know what you are up to. I hate—

Q: Well, I am sorry if you feel like I am up to something, I am just here asking questions. What I want to know is the truth about this matter and this. You could have spoken against the closing of the road without calling Kim Parrish a liar, couldn't?

A: Well, I thought it would be best to reveal her character and let the county council know that the road shouldn't be closed on that statement, that a man was run over.

. . .

Q: Well, lets [sic] talk about what you did say, okay?

A: Alright.

316

Q: Alright, we know you called her a liar, correct?

A: Did I call her a liar?

Q: Yes, sir.

A: Well, I didn't mean to damage her character. All I meant was to get it across to the county council that we were dealing with an unreliable person, in the newspaper.

Q: Now, you also, I believe, said that she conned your mother into signing the whole place over to her, didn't you?

A: I believe I did say that.

Q: And her insurance money too, didn't you?

A: And you know what my basis for—

Q: What I am saying, and insurance money too, correct?

A: Right, right.

Q: And you said both of those things to county council, didn't you?

A: Yes.

Q: And that didn't have a thing to do with closing Allison Road?

A: No, but it was bringing out the character, bringing out the character.

Q: Did it have anything to do with closing Allison Road?

A: Yes, it did. That helped keep the road open in my opinion.

Q: Okay. So, your personal attack upon her of telling those things was for the purpose of trying to keep the road open to discredit her, is that right?

A: I was trying to keep the road open, that is right.

Q: And trying to discredit Kim Parrish?

A: I wasn't trying to discredit her or anything. I was just bringing out the straight facts.

Q: Just bringing out the straight facts?

A: Right.

Q: And you wanted the county council—

A: To believe that she was an unreliable person.

Q: And you wanted the county council and all of those persons in attendance and whoever may hear this, whether it be on TV or otherwise to believe that she was a person who stole your mother's land, didn't you?

A: I didn't say she stole it.

Q: That was what you wanted, didn't you, isn't that what you wanted?

A: No, that is not what I wanted, no.

On direct examination by his own attorney, Allison further explained the circumstances behind his statements.

Q: And then you went on to say [at the county council meeting], you used the word, con?

A: Right.

Q: Her out of real estate and insurance proceeds. What were you saying there in your mind's eye?

A: My view on this is that. I believe in all my heart that Mary Ellen, my sister and Kim, they were working together. And they had convinced my mother that she should sign that deed to my sister which she did, she signed the deed, her mind wasn't right at all when she signed it. But she signed everything she had to my sister, I didn't find this out until my mother died. And before my mother died my sister signed everything over to Kim Parrish.

Q: And what—?

A: And with all the children and grandchildren I don't see why, there was 41 of us and the one person she picked out was Kim. But that was working between my sister and Kim.

Q: Now, what type of force did they bring to bear on your mother do you think, how did they do that?

A: What did they do now?

Q: How did they do that?

A: How did they do what?

Q: Did they persuade your mother?

A: Oh yes, they persuaded my mother, no doubt about that.

The trial court denied Parrish's motion for directed verdict at the close of Allison's case. Prior to jury instructions, Parrish renewed her objection that Allison had not pled the affirmative defense of truth. The trial court ruled "I certainly think that reading the answer in a liberal manner, even though it is an affirmative defense I think that it was affirmatively stated that they were going to plead that." The trial court charged the jury: "The defendant must prove by a greater weight of the preponderance of the evidence that the statement was substantially true or true in substance. A statement is not defamatory if it is essentially true." The jury returned a verdict in Allison's favor. The trial court denied Parrish's motions for a new trial or judgment not withstanding the verdict.

## ISSUES

1. Did the trial judge err in denying motions for directed verdict and judgment notwithstanding the verdict because the statements of the respondent constituted slander *per se* ?

2. Did the trial judge err in allowing Allison to present truth as a defense and in charging the jury on truth when truth was not pled as an affirmative defense?

## STANDARD OF REVIEW

"In an action at law, on appeal of a case tried by a jury, the jurisdiction of the appellate court extends merely to the correction of errors of law, and a factual finding by a jury will not be disturbed unless a review of the record discloses that there is no evidence which reasonably supports the jury's finding." *Erickson v. Jones Street Publishers, LLC,* 368 S.C. 444, 464, 629 S.E.2d 653, 663 (2006); *Townes Assoc., Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976). "When ruling on a motion for summary judgment or directed verdict in a defamation action, the court must review the evidence using the same substantive evidentiary standard of proof the jury is required to use in a particular case." *Erickson,* 368 S.C. at 464, 629 S.E.2d at 663; *George v. Fabri,* 345 S.C. 440, 451-54, 548 S.E.2d 868, 874-75 (2001). An appellate court

reviews the granting of such a motion using the same standard. *Erickson*, 368 S.C. at 464, 629 S.E.2d at 663.

"In ruling on motions for directed verdict or judgment notwithstanding the verdict, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing motions. The trial court must deny the motions when the evidence yields more than one inference or its inference is in doubt." *Steinke v. South Carolina Dep't of Labor, Licensing & Reg.*, 336 S.C. 373, 386, 520 S.E.2d 142, 148 (1999); *accord Hurd v. Williamsburg County*, 363 S.C. 421, 611 S.E.2d 488 (2005); *Hinkle v. Nat'l Cas. Ins. Co.*, 354 S.C. 92, 96, 579 S.E.2d 616, 618 (2003); *Collins Entertainment, Inc. v. White*, 363 S.C. 546, 611 S.E.2d 262 (Ct.App. 2005); *Lingard v. Carolina By–Products*, 361 S.C. 442, 446, 605 S.E.2d 545, 547 (Ct.App.2004). When the evidence yields only one inference, a directed verdict in favor of the moving party is proper. *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 334 S.C. 469, 476–77, 514 S.E.2d 126, 130 (1999); *Sims v. Giles*, 343 S.C. 708, 714, 541 S.E.2d 857, 860 (Ct.App. 2001). However, if the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and the motion should be denied. *Jinks v. Richland County*, 355 S.C. 341, 345, 585 S.E.2d 281, 283 (2003); *Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995); *The Huffines Co., LLC v. Lockhart*, 365 S.C. 178, 187, 617 S.E.2d 125, 129 (Ct.App.2005).

When considering directed verdict motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence. *Erickson v. Jones Street Publishers, LLC*, 368 S.C. 444, 463, 629 S.E.2d 653, 663 (2006); *Harvey v. Strickland*, 350 S.C. 303, 308, 566 S.E.2d 529, 532 (2002); *Pond Place Partners v. Poole*, 351 S.C. 1, 15, 567 S.E.2d 881, 888 (Ct.App. 2002). The issue must be submitted to the jury whenever there is material evidence tending to establish the issue in the mind of a reasonable juror. *Hanahan v. Simpson*, 326 S.C. 140, 149, 485 S.E.2d 903, 908 (1997). Yet, this rule does not authorize submission of speculative, theoretical, and hypotheti-

320

cal views to the jury. *Small v. Pioneer Mach., Inc.,* 329 S.C. 448, 461, 494 S.E.2d 835, 842 (Ct.App.1997).

## *LAW/ANALYSIS*

■ Parrish contends the trial judge erred in denying her motions for directed verdict and judgment notwithstanding the verdict because Allison's statements constituted slander *per se.* Following our supreme court's directive in *Holtzscheiter v. Thomson Newspapers, Inc.,* 332 S.C. 502, 508, 506 S.E.2d 497, 502 (1998), we will analyze this slander action in two parts. A statement is (1) either defamatory *per se* or defamatory *per quod,* and (2) actionable *per se* or not actionable *per se. See also Goodwin v. Kennedy,* 347 S.C. 30, 552 S.E.2d 319, n. 1 (Ct.App.2001).

## I. Defamatory *Per Se* or Defamatory *Per Quod*

■ The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff. *Holtzscheiter,* 332 S.C. at 508, 506 S.E.2d at 502; *Murray v. Holnam, Inc.,* 344 S.C. 129, 138, 542 S.E.2d 743, 748 (Ct.App.2001). Defamatory communications take two forms: libel and slander. *Holtzscheiter,* 332 S.C. at 508, 506 S.E.2d at 502. Libel is the publication of defamatory material by written or printed words, by its embodiment in physical form or by any other form of communication that has the potentially harmful qualities characteristic of written or printed word. *Id.* at 517, 506 S.E.2d at 505 (Toal, J., concurring); Restatement (Second) of Torts, § 568 (1977). Slander is a spoken defamation. *Id.* at 508, 506 S.E.2d at 501; *see also Swinton Creek Nursery v. Edisto Farm Credit,* 334 S.C. 469, 484, 514 S.E.2d 126, 134 (1999).

■ To recover for defamation, the plaintiff must establish by a preponderance of the evidence, that there was (1) a false and defamatory statement by the defendant concerning the plaintiff; (2) an unprivileged communication; (3) fault on the defendant's part in publishing the statement; and (4) either actionability of the statement irrespective of special harm or the existence of special harm to the plaintiff caused by the publication. *Holtzscheiter,* 332 S.C. at 518, 506 S.E.2d at 506

(Toal, J., concurring); *Fleming v. Rose*, 350 S.C. 488, 494, 567 S.E.2d 857, 860 (2002).

"A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating with him." *Holtzscheiter*, 332 S.C. at 530, 506 S.E.2d at 513 (Toal, J., concurring). With this first element of defamation, the trial court must initially determine if the communication is reasonably capable of conveying a defamatory meaning. *Id.* at 530, 506 S.E.2d at 513; *White v. Wilkerson*, 328 S.C. 179, 183, 493 S.E.2d 345, 347 (1997). If the defamatory meaning of a message or statement is obvious on the face of the statement, the statement is defamatory *per se*. *Holtzscheiter*, 332 S.C. at 508–09, 506 S.E.2d at 501. "If the defamatory meaning is not clear unless the hearer knows the facts or circumstances not contained in the statement itself, then the statement is defamatory *per quod*. In cases involving defamation *per quod*, the plaintiff must introduce facts extrinsic to the statement itself in order to prove a defamatory meaning." *Id.*

"If the question is one on which reasonable minds might differ, then it is for the jury to determine which of the two permissible views they will take." *Id.* at 530, 506 S.E.2d at 512 (Toal, J., concurring). Some statements are so clearly innocent or defamatory the court is justified in determining the question itself. *Id.* "In making the determination of whether to submit the issue to the jury, the trial court may consider not only the statement on its face, but also evidence of any extrinsic facts and circumstances." *Id.*

Here, after Parrish had presented her witnesses, both parties moved for and were denied motions for directed verdict. The trial judge stated, "While I think the statements may in fact be defamatory, that only establishes one element that the plaintiff would have to prove." Without committing to a finding of defamatory *per se*, the judge explained that whether they were actionable *per se* was an additional element over which conflicting testimony had created a jury issue.

## II. Actionable *Per Se* or Not Actionable *Per Se*

In addition to being defamatory *per se* or *per quod*, "[a] separate issue is whether the statement is 'actionable *per se*' or not. This issue is one of pleading and proof, and is always a question of law for the court." *Holtzscheiter*, 332 S.C. at 510, 506 S.E.2d at 502; *Capps v. Watts*, 271 S.C. 276, 246 S.E.2d 606 (1978). If the defamation is actionable *per se*, the law presumes the defendant acted with common law malice and that the plaintiff suffered general damages. If the defamation is not actionable *per se*, then the plaintiff must plead and prove common law actual malice and special damages. *Holtzscheiter*, 332 S.C. at 510, 506 S.E.2d at 502.

When assessing the question of actionable *per se* or not actionable *per se*, an important distinction is drawn between the defamation in the form of libel and in the form of slander. With libel, "if the trial judge can legally presume, because of the nature of the statement, that the plaintiff's reputation was hurt as a consequence of its publication, then the libel is actionable *per se*." Id. at 510, 506 S.E.2d at 502. In contrariety, "slander is actionable *per se* only if it charges the plaintiff with one of five types of acts or characteristics: (1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or profession." Id. at 511, 506 S.E.2d at 502. "In all other cases-namely, when slander does not fall into the above-named categories-special damages must be established." Id. at 526, 506 S.E.2d at 510 (Toal, J., concurring).

In the case *sub judice*, Parrish argues the statements charge her with a crime of moral turpitude. She avers the allegations made by Allison are unambiguous and not susceptible of innocent construction. We found no case in South Carolina that specifically addressed the nature of the word "con." However, dictionary definitions include swindle, manipulate, persuade, and cajole. *See, e.g.*, Merriam Webster's Collegiate Dictionary (10th ed.1993). A few cases from other jurisdictions considered this term and held "con" can have an innocent meaning. *See Quinn v. Jewel Food Stores, Inc.*, 276 Ill.App.3d 861, 213 Ill.Dec. 204, 658 N.E.2d 1225 (1995) (finding terms including "con artist" as contained in plaintiff's

employee evaluation form capable of innocent meaning); *Rizzuto v. The Nexxus Products Co.*, 641 F.Supp. 473 (S.D.N.Y. 1986) (in context of trade journal advertisement, phrases including "don't be conned" are mere rhetorical hyperbole rather than accusation of criminal conduct and use of word "conned" was an expression of opinion not giving rise to action for libel).

 South Carolina law allows contemplation of the context and circumstances under which words are spoken when determining if the words have a defamatory meaning or are actionable *per se.* The resolution of conflicting meanings is reserved for the jury. In *Smith v. Smith,* 194 S.C. 247, 9 S.E.2d 584, 589 (1940), our supreme court instructed:

> If words are susceptible of two meanings, one imputing a crime, and the other innocence, the latter is not to be adopted, and the other rejected, as a matter of course. In such a case, it must be left to the jury to decide in what sense defendant used them. Their conclusion must be formed from the whole of the circumstances attending the publication, including the sense in which the witnesses understood the words.

*Id.* at 257, 9 S.E.2d at 589 (quoting *Jenkins v. Southern Ry. Co.,* 130 S.C. 180, 183, 125 S.E. 912, 913 (1924)); *see also Sandifer v. Electrolux Corp.,* 172 F.2d 548 (1949); *Jones v. Garner,* 250 S.C. 479, 485, 158 S.E.2d 909, 912 (1968) ("[A]ll of the parts of the publication must be considered in order to ascertain the true meaning, and words are not to be given a meaning other than that which the context would show them to have."); *Leevy v. North Carolina Mut. Life Ins. Co.,* 184 S.C. 111, ——, 191 S.E. 811, 814 (1937); *Turner v. Montgomery Ward & Co.,* 165 S.C. 253, 261, 163 S.E. 796, 798–99 (1932) ("[T]he evidence adduced by the plaintiff in the case at bar required the submission to the jury of the question whether the language used by [the defendant] charged the plaintiff with the commission of such crime."); *Goodwin v. Kennedy,* 347 S.C. 30, 552 S.E.2d 319 (Ct.App.2001) (rejecting defendant's argument that if context is considered then statement cannot, as a matter of law, be actionable *per se;* affirming submission to jury issue of whether defendant stating plaintiff acting like a "house n* * * *r" in his position as vice-principal

actionable *per se* ); *Wardlaw v. Peck*, 282 S.C. 199, 318 S.E.2d 270 (Ct.App.1984) ("How the words were to be understood in the circumstances in which they were uttered was a question for the jury, not the court, to decide.").

When denying both parties' directed verdict motions made at the end of the plaintiff's case, the judge stated:

I think there has been conflicting testimony as to whether or not those statements taken in their entirety, interpreting those based upon the circumstances would be slander per se. While the, I think the meaning of the word, conned, is certainly a common term that anyone could define and that is what constitutes the defamation. Whether or not that is in fact computing that she was, or has committed a crime of moral turpitude would be something that the jury would have to consider in light of all the statements and the acts and circumstances.

The parties again moved for directed verdicts after the close of the defendant's case, and the judge reiterated:

I think there is a jury question that exist [sic] as to whether or not the statements made were slanderous per se, whether or not the statements reasonably may be understood to charge the plaintiff with the crime of larceny or breach of trust or some other offense. I think it is something that the jury will have to determine based on the totality of the statements and the circumstances under which they were made. So, I am going to allow it to go the jury for that consideration.

After the jury returned a verdict for Allison, Parrish moved for judgment notwithstanding the verdict. The judge denied the motion and said:

As to the slander per se, I think there was evidence that required the jury to make a determination as to whether the words spoken would of put the person who heard it in, to know what was being charged was a crime of moral turpitude and that became a jury issue which they ultimately decided.

Parrish posits the holdings of *Lily v. Belk's Dep't Store*, 178 S.C. 278, 182 S.E. 889 (1935) and *Herring v. Lawrence Warehouse Co.*, 222 S.C. 226, 72 S.E.2d 453 (1952), demand the reversal of the trial court. In *Lily*, the plaintiff left a depart-

ment store after making a purchase but was stopped by a store clerk. He told her he wanted to see what she had put in the bags, and he searched the bags in the presence of people on the street. A jury found for the plaintiff in her subsequent slander action. On appeal, the defendant alleged the trial court erred in denying his motion for a nonsuit based on the ground that the testimony neither supported an action for slander because the language did not charge the plaintiff with a crime, nor did it did become actionable by virtue of the circumstances.

The court held a charge of a crime need not be express but, with verbal slander, words are to be given their ordinary and popular meaning. And when words are susceptible of an innocent meaning and one imputing a crime, the jury must decide in what sense they were used. Id. at 282, 182 S.E. at 891. The court instructed "where the words used are not actionable in themselves, they require the pleading of an innuendo to explain or determine their defamatory nature, and in such case are said to be [not actionable *per se* ]." *Id.*[1] Applying *Lily* to the case at bar, we hold Allisons statements carried sufficient possibility of defamation to support an action, but whether they equated to the charge of a crime was properly submitted to the jury.

Parrish cites *Herring v. Lawrence Warehouse Co.*, 222 S.C. 226, 72 S.E.2d 453 (1952), to assert "con" must be actionable *per se* if calling an employee "short" was so held. In *Herring*, an auditor accused the plaintiff, a warehouse manager, of being "short" on equipment entrusted to his care. The plaintiff was immediately fired. Our supreme court held the statement was unambiguous and actionable *per se*. The holding was not based solely on the language, but the scale was tipped by the court's evaluation of the circumstances. "When considered in connection with the fact that appellant was immediately discharged and the keys of the warehouse demanded, it is clear that appellant was charged with the commission of a crime." *Id.* at 235, 72 S.E.2d at 455. The reaction of the hearers led the court to hold the statement

---

1. Innuendo is extrinsic evidence used to prove a statement's defamatory nature. 50 Am.Jur.2d *Libel and Slander* 137 (1995). It includes the aid of inducements, colloquialisms, and explanatory circumstances. *Lily v. Belk's Dep't Store*, 178 S.C. 278, 182 S.E. 889 (1935).

unquestionably charged a crime. Parrish has not shown equivalent evidence upon which a similar finding may be based.

We hold the trial judge did not err in denying Parrish's motions for directed verdict and judgment notwithstanding the verdict. Viewing the evidence in the light most favorable to Allison, there was evidence that the statements, though decidedly unflattering, were reasonably susceptible of a construction short of a crime of moral turpitude. Conflicting testimony over whether the statements meant Parrish persuaded Allison's mother or stole from her created a credibility issue. Accordingly, whether the statements were defamatory *per se* and actionable *per se* was a question for the jury as the finders of fact.

### III. Truth as an Affirmative Defense to Defamation

■ Parrish contends the trial court erred in allowing Allison to assert the truth of his statements, even though he did not affirmatively plead it as a defense in his answer. We agree.

■■ Under common law, a defamatory communication was presumed to be false, but truth could be asserted as an affirmative defense. *See Beckham v. Sun News*, 289 S.C. 28, 30, 344 S.E.2d 603, 604 (1986); *see also Herring v. Lawrence Warehouse Co.*, 222 S.C. 226, 234, 72 S.E.2d 453, 455 (1952) (holding South Carolina jurisprudence has consistently held statements that are actionable *per se* are presumed false). However, the Supreme Court's holding in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 768–69, 106 S.Ct. 1558, 89 L.Ed.2d 783, (1986), modified the common law rule holding when a newspaper publishes speech of public concern, a private figure plaintiff cannot recover damages without showing the statements are false. If the statements are a matter of private concern, the plaintiff is not required to prove falsity. *Id.* Thus, truth is an affirmative defense as to which the defendant has the burden of pleading and proof, unless the statement involves a constitutional issue. *See* Hubbard and Felix, *The South Carolina Law of Torts* 468, 478 (2d. ed.1997).

■ A party, in pleading to a preceding pleading, shall affirmatively set forth his defenses to the opposing party's

complaint. Rule 8(c), SCRCP. Further, "[e]very defense, in law or fact, to a cause of action in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto...." Rule 12(b), SCRCP. Generally, affirmative defenses to a cause of action in any pleading must be asserted in a party's responsive pleading. *Strickland v. Strickland,* Op. No. 26375, (S.C. Filed August 27, 2007) (Shearouse Adv. Sh. No. 32 at 58) (citing *Wright v. Craft,* 372 S.C. 1, 20–21, 640 S.E.2d 486, 497 (Ct.App.2006)). "The failure to plead an affirmative defense is deemed a waiver of the right to assert it." *Craft,* 372 S.C. at 21, 640 S.E.2d at 497 (citing *Adams v. B & D, Inc.,* 297 S.C. 416, 419, 377 S.E.2d 315, 317 (1989)).

 In construing a complaint or responsive pleading, the court must review the entire pleading. *See Doe ex rel. Legal Guardian v. Barnwell School Dist. 45,* 369 S.C. 659, 663, 633 S.E.2d 518, 520 (Ct.App.2006). "To ensure substantial justice to the parties, the pleadings must be liberally construed." *Gaskins v. S. Farm Bureau Cas. Ins. Co.,* 343 S.C. 666, 671, 541 S.E.2d 269, 271 (Ct.App.2000), *aff'd as modified on other grounds,* 354 S.C. 416, 581 S.E.2d 169 (2003); *see* Rule 8(f), SCRCP (providing that all pleadings must be construed to do substantial justice to all parties).

A defamatory communication is presumed to be false under the common law. The plaintiff does not have the burden of proving falsity. However, truth can be asserted as an affirmative defense, the burden of which is on the defendant. The trial court allowed Allison to assert the truth of his accusation in the presentation of his case. In addition, the trial court instructed the jury that "the defendant must prove by a greater weight of the preponderance of the evidence that the statement was substantially true or true in substance." The charge afforded Allison the benefit of the affirmative defense of truth without his being required to affirmatively plead it.

In response to Parrish's objection, the trial court explained Allison's answer, read liberally, "affirmatively stated that they were going to plead [truth as a defense]." Our reading of the responsive pleading as a whole mandates a different interpretation. Allison's denial of Parrish's claims was not directly based on the assertion that the communication was true, but

instead focused on Allison's intention, mistake in speaking out of context, and apology. Specifically, Allison asserted:

that he did not *intend* to make any false and malicious accusations against the plaintiff in any regard and can only apologize and offer the plaintiff assurances that the defendant bears no ill will against the plaintiff and regrets that any statements may have been made that anywise questions the plaintiff's integrity....

[T]he defendant would again allege and show that to the extent any comments were made out of context and inappropriate, those in attendance realize the circumstances of the dispute concerning the closing of the road, and the defendant does apologize for any intemperate remarks which should not have been uttered or said in any regard.

We acknowledge the rule compels reading the pleadings as a whole, liberally, and with the purpose of ensuring substantial justice to the parties. However, in this instance, even the most liberal reading fails to persuade us that Allison affirmatively asserted the defense that his statements made about Parrish were true.

## CONCLUSION

We hold Allison's statements about Parrish did not constitute slander *per se*. We rule that Allison failed to plead truth as an affirmative defense. The trial court erred in allowing Allison to argue truth as a defense and in charging truth as a defense. Accordingly the case is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

WILLIAMS, J., concurs.

SHORT, J., concurs in result in a separate opinion.

SHORT, J., concurs in result.

I concur with the majority that the judgment must be reversed based on the trial court's error in allowing Allison to assert truth, even though he did not affirmatively plead truth as a defense. I write separately, however, because I believe

the trial court also erred in failing to direct a verdict on the issue of slander per se.

In light of the attendant circumstances, I find Allison's statements charged Parrish with the commission of a crime of moral turpitude. *See Flowers v. Price*, 192 S.C. 373, 378, 6 S.E.2d 750, 752 (1940) (considering extrinsic circumstances to determine if words are slanderous per se). At the meeting, Allison stated that Parrish "conned" his mother into signing over her land and "conned" her out of her insurance money. Extrinsic circumstances included Allison's intent to discredit Parrish by many references to her alleged dishonesty including the statement that she was a liar. The words spoken are actionable if they convey to the minds of the listeners, and would naturally be understood to mean, the plaintiff has committed a crime. Id. at 377, 6 S.E.2d at 752. Any words actually or impliedly stating the plaintiff's guilt, or raising a strong suspicion of it in the minds of the hearers, are sufficient. *Porter v. News & Courier Co.*, 237 S.C. 102, 108, 115 S.E.2d 656, 658 (1960). *See Herring v. Lawrence Warehouse Co.*, 222 S.C. 226, 235, 72 S.E.2d 453, 455 (1952) (finding statement that an employee is "short," made during an audit and coupled with immediate firing, actionable per se).

Considering the context in which Allison's statements were made, I conclude the statement that Parrish "conned" Allison's mother out of her house and insurance money charged Parrish with the commission of a crime of moral turpitude such as obtaining property by false pretenses. *See* S.C.Code Ann. § 16–13–240 (2003) ("A person who by false pretense or representation ... obtains from another person any ... money ... or other property ... is guilty of a: (1) felony ... if the value of the property is five thousand dollars or more...."). Obtaining property under false pretenses is a crime of moral turpitude. *State v. Moore*, 128 S.C. 192, 199, 122 S.E. 672, 674 (1924); *Carruth v. Brown*, 202 Ga.App. 656, 415 S.E.2d 470, 471 (1992). Under these circumstances, I find Allison's statements charged Parrish with the commission of a crime of moral turpitude and the trial court erred in denying Parrish's motion for a directed verdict on the issue of slander per se.