698 S.E.2d 845

**Sherrie Mann MCBRIDE, Appellant,**

v.

**SCHOOL DISTRICT OF GREENVILLE COUNTY, Respondent.**

**No. 4718.**

Court of Appeals of South Carolina.

Heard April 15, 2010.

Decided Aug. 4, 2010.

548

552

Katherine Carruth Goode, of Winnsboro and David Lloyd Thomas of Greenville, for Appellant.

N. Heyward Clarkson, III, Sean A. Scoopmire and John D. Harjehausen, of Greenville, for Respondent.

GEATHERS, J.

Appellant Sherrie Mann McBride (McBride) brought this action against Respondent School District of Greenville County (the District), asserting causes of action for breach of contract, wrongful discharge, defamation of character, abuse of process, false imprisonment, malicious prosecution, intentional infliction of emotional distress, negligence, negligence per se, and gross negligence. McBride challenges the circuit court's order granting a directed verdict for the District on her causes of action for defamation of character, abuse of process, false imprisonment, and malicious prosecution. We affirm in part, reverse in part, and remand for a new trial.

## FACTS/PROCEDURAL HISTORY

The facts in the light most favorable to McBride are as follows. McBride began her teaching career in August 2000 as a special education teacher at Berea High School in Greenville County. Near the end of the 2001–2002 school year, she also served as a teacher for a home-bound student, John Doe (Doe),[1] for approximately six weeks. Doe, whom McBride and others understood to be homosexual, was home-bound because he had been having anxiety attacks whenever he attended classes on campus. His anxiety attacks stemmed from the emotional trauma he experienced from being sexually abused by a teacher while attending Greenville Technical Charter High School. Between the time he attended this school and the time he began attending Berea High School, he attempted suicide and was committed to the state mental hospital. During the time McBride served as Doe's home-bound teacher, they developed an emotional bond.

Doe resumed class attendance for the 2002–2003 school year, but he was not in any of McBride's classes. Neverthe-

---

1. The former student's named has been changed to protect his identity.

less, he visited McBride on an increasingly frequent basis. At this time, he was still experiencing anxiety and began cutting himself. On one occasion he showed McBride cuts extending the length of his arms, and she consulted another teacher for guidance on how to handle the situation.

After this incident, according to McBride, the school guidance counselor and Doe's teachers worked out an arrangement allowing Doe to stay in McBride's classroom during one of his morning classes and one of his afternoon classes, provided he obtain his assignments at the beginning of class time and return his work to his teachers at the end of class time. During his time in McBride's classroom, when he was not working on his assignments, he helped McBride with lesson planning, grading papers, setting up computer equipment, and performing other tasks related to McBride's classes.

At the beginning of the 2003–2004 school year, Doe continued to stay in McBride's classroom during some of his classes. He frequently complained of being abused by his parents and expressed a desire to run away from home. He began storing clothing in a file drawer in McBride's classroom and requested advice about becoming emancipated from his parents. McBride did not give him any advice about becoming emancipated, but Doe consulted the school resource officer, Deputy Daniel Oslager, on the topic. Deputy Oslager was an employee of the Greenville County Sheriff's Department.

In mid-September, McBride took Doe with her on an errand after school to buy educational supplies and allowed him to drive her car. Doe's mother had given him permission to accompany McBride, but she became angry when McBride brought him home after his 7 p.m. curfew. Several days later, McBride allowed Doe to drive her car after school hours on what she thought would be a very short trip to a grocery store near the school. Although Doe only had a learner's permit to drive, McBride thought he had a license with full driving privileges. Doe drove McBride's car to pick up his friend, Chris Boehmke (Chris), at his house and to take him back to the school.

Later that afternoon, McBride gave Doe and Chris a ride to Chris' house. She was under the impression that Chris was merely having a sleepover at his house because she knew that

Doe had been going home with Chris on Fridays on a regular basis. However, Doe had decided to run away from home that weekend. He planned on staying at Chris' house on Friday night, then traveling to Marietta, Georgia to live with his aunt.

When McBride arrived at Chris' house, she went inside and spoke with his mother, Linda Boehmke. Mrs. Boehmke became upset when Doe mentioned that he wanted to run away from home. McBride told Mrs. Boehmke that Doe "says stuff like that all the time" and that she did not think that Doe's aunt was going to come to Greenville to take him home with her. McBride also told Mrs. Boehmke to telephone her if she had any concerns later that night and that McBride could then contact Deputy Oslager.

Later that night, Doe's mother went to the Boehmkes' house looking for Doe. Mrs. Boehmke was concerned about Doe's allegations of being abused by his parents, so she told his mother that he was not there. Doe's mother also telephoned McBride and left a voice mail message asking if she knew where Doe was. McBride did not check her voice mail messages until the next day, and she failed to return the call.

The next day, McBride found Doe sitting on her door step. He told her that he was trying to run away from home but that Mrs. Boehmke had made him leave her house. McBride allowed Doe to enter her home, but she telephoned Deputy Oslager to report that Doe was trying to run away from home. Deputy Oslager advised McBride to call the sheriff's office. McBride did so, and an officer later arrived at her house to pick up Doe. The officer later returned Doe to his parents.

A few days later, McBride noticed that her car was missing from the school parking lot. As she was standing there, Deputy Oslager arrived and asked McBride what was going on. When she told him that her car had been stolen, he began taking notes. She then realized that Doe might have been the one who took her car. She advised Oslager of this possibility but said that she did not want to press charges. Oslager insisted that either Doe would be charged with an offense for taking the car or McBride would be charged for allowing him to drive it. McBride then reluctantly allowed Oslager to charge Doe with taking the car. A few minutes later, Doe drove McBride's vehicle into the parking lot. Oslager re-

moved Doe from the car and arrested him. When Doe's mother arrived at the scene, she demanded that McBride stay away from her son.

The school principal, William Roach (Roach) questioned Doe, after which Oslager took him to the law enforcement center for further questioning. During questioning, Doe told Oslager that McBride had allowed him to drive her car on previous occasions, that she had written passes for him to get out of classes, and that she had given him passwords to access various school computer systems. Oslager telephoned Roach several times to consult with him about these statements. Doe also told Oslager that McBride knew he was running away from home when she took him to Chris Boehmke's house. Oslager communicated this information to his supervisor, Sergeant Shea Smith, who began an investigation into McBride's conduct.

Sergeant Smith assigned Deputy Leslie Lambert to be the lead investigator. Oslager assisted Lambert in taking statements from teachers, including McBride herself, and other school staff members. Deputy Lambert presented the information gathered from the investigation to the solicitor's office. Deputy Solicitor Betty Strom and assistant solicitor Howard Steinberg agreed that the charges of contributing to the delinquency of a minor and enticing an enrolled child from school attendance should be taken to a magistrate for a determination of probable cause to arrest McBride. A magistrate issued corresponding arrest warrants, and assistant solicitor John Rowell signed an indictment charging McBride with contributing to the delinquency of a minor.[2] The grand jury true billed this indictment, and Deputy Oslager later arrested McBride.

---

2. There is nothing in the record indicating that the solicitor's office presented an indictment to the grand jury for the charge of enticing an enrolled child from attendance in school. The likely reason is that the charge was for a first offense, and S.C.Code Ann. § 16-17-510 (2003) requires a first or second offense to be tried exclusively in magistrate's court. Further, S.C. Const. art. I, § 11 and S.C.Code Ann. § 17-19-10 (2003) exempt charges prosecuted in magistrate's court from the requirement that an indictment be presented to a grand jury before a criminal charge is prosecuted.

Oslager took McBride to the law enforcement center, where she was booked and fingerprinted. She was later released on bond, and the criminal charges were ultimately dropped. However, the District's superintendent recommended to the Board of Trustees that McBride be terminated. The Board voted to accept the recommendation.

Several local television stations reported McBride's arrest and quoted sheriff's office investigators regarding allegations that she allowed Doe to drive her car, helped him run away from home, and signed him out of class. The newscasts described McBride's relationship with Doe as "bizarre" and implied that students could not be safe with McBride. One of the stories quoted the superintendent as saying that he was going to recommend McBride for termination. Another story quoted unidentified teachers as saying "There is a lot of gray area" in drawing the line in a relationship with a student.

After McBride was dismissed from Berea High School, the District's equipment that had been allotted to her classroom was transferred to her colleagues' classrooms. One of her colleagues heard Roach accuse McBride of stealing this equipment when he stated "She cleaned us out."

McBride filed this action against the District and Roach, asserting causes of action for breach of contract, wrongful discharge, defamation of character, abuse of process, false imprisonment, malicious prosecution, intentional infliction of emotional distress, negligence, negligence per se, and gross negligence. Both Roach and the District filed motions for summary judgment. The circuit court granted summary judgment to Roach on all of the causes of action and granted summary judgment to the District on McBride's causes of action for breach of contract, wrongful discharge, negligence, negligence per se, and gross negligence. The District later filed a second summary judgment motion, and the circuit granted the motion as to McBride's cause of action for intentional infliction of emotional distress.

At trial, the circuit court granted a directed verdict for the District on the remaining causes of action (defamation of character, abuse of process, false imprisonment, and malicious prosecution). In explaining his ruling, the presiding judge cited the South Carolina Tort Claims Act, S.C.Code Ann.

§§ 15–78–10 to –220 (2005 & Supp.2009) (the Tort Claims Act or the Act) as a bar to McBride's claims for abuse of process and malicious prosecution.[3] The judge also ruled that there was no evidence of any defamatory statement made by the District and that the prosecution was solely instituted by the sheriff's office. This appeal followed.

## ISSUE ON APPEAL

Did the circuit court err in directing a verdict for the District on McBride's causes of action for defamation of character, abuse of process, false imprisonment, and malicious prosecution?

## STANDARD OF REVIEW

In ruling on a directed verdict motion, the trial court must view the evidence and the inferences reasonably drawn from the evidence in the light most favorable to the party opposing the motion. *Parrish v. Allison,* 376 S.C. 308, 319, 656 S.E.2d 382, 388 (Ct.App.2007). "The trial court must deny the motion[ ] when the evidence yields more than one inference or an inference is in doubt." *Id.* "When the evidence yields only one inference, a directed verdict in favor of the moving party is proper." *Id.* "However, if the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and the motion should be denied." *Id.*

When considering directed verdict motions, *neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence.* The issue must be submitted to the jury whenever there is material evidence tending to establish the issue in the mind of a reasonable juror. Yet, this rule does not authorize submission of speculative, theoretical, and hypothetical views to the jury.

*Id.* at 319–20, 656 S.E.2d at 388 (citations omitted) (emphasis added).

---

**3.** *See* S.C.Code Ann. § 15–78–60(17) (2005) ("The governmental entity is not liable for a loss resulting from … employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude[.]").

## LAW/ANALYSIS

McBride contends that the circuit court erred in directing a verdict for the District on her claims for defamation of character, abuse of process, false imprisonment, and malicious prosecution. We agree that the circuit court improperly directed a verdict for the District on the defamation and abuse of process causes of action. However, the circuit court correctly directed a verdict for the remaining causes of action.

### I. *Defamation*

McBride argues that a jury issue existed as to the publication of "false and defamatory statements by the . . . District's employees." McBride points to the following instances of statements or conduct she claims are defamatory and are attributable to employees of the District: (1) Roach's allegation that McBride stole school property after she was dismissed ("She cleaned us out"); (2) the District superintendent, William Harner, "made public comments about Ms. McBride, her arrest, and her [alleged] misconduct[;]" (3) "one of the accounts attributed comments to unnamed teachers from the School District[;]" and (4) Roach and Oslager coerced false statements from Doe in their efforts to fabricate charges against McBride. As to the fourth item, McBride argues that the conduct of Roach and Oslager "in orchestrating Ms. McBride's arrest, for the District's own purposes and in an effort to discredit and dismiss her, fits squarely within the category of actionable defamation accomplished by actions or conduct." [4] We agree as to item 1 but disagree as to the remaining items.

The tort of defamation permits a plaintiff to recover for injury to her reputation as the result of the defendant's communications to others of a false message about the plaintiff. *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 508, 506 S.E.2d 497, 501 (1998). To prove defamation, the plaintiff must show (1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third

---

4. *See Murray v. Holnam, Inc.*, 344 S.C. 129, 138, 542 S.E.2d 743, 748 (Ct.App.2001) ("Slander is a spoken defamation, while libel is a written defamation *or one accomplished by actions or conduct.*") (emphasis added).

party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Fleming v. Rose*, 350 S.C. 488, 494, 567 S.E.2d 857, 860 (2002). "The publication of a statement is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.*

Defamatory communications may be in the form of libel or slander. *Holtzscheiter*, 332 S.C. at 508, 506 S.E.2d at 501. A statement is classified as defamatory *per se* when the meaning or message is obvious on its face, and defamatory *per quod* when the defamatory meaning is not clear unless the hearer knows facts or circumstances not contained in the statement. *Erickson v. Jones Street Publishers, LLC*, 368 S.C. 444, 465, 629 S.E.2d 653, 664 (2006). Even "[a] mere insinuation is actionable as a positive assertion if it is false and malicious and its meaning is plain." *Murray*, 344 S.C. at 139, 542 S.E.2d at 748. However, when the statement is defamatory *per quod*, "the plaintiff must introduce extrinsic facts to prove the defamatory meaning." *Erickson*, 368 S.C. at 465, 629 S.E.2d at 664.

Additionally, a statement may be actionable *per se* or not actionable *per se*. *Id.* "The determination of whether or not a statement is actionable *per se* is a matter of law for the court to resolve." *Id.* When the statement is classified as actionable *per se*, the defendant is presumed to have acted with common law malice, and the plaintiff is presumed to have suffered general damages. *Id.* When the statement is not actionable *per se*, "the plaintiff must plead and prove both common law malice and special damages." *Id.* "Common law malice means the defendant acted with ill will toward the plaintiff, or acted recklessly or wantonly, i.e., with conscious indifference of the plaintiff's rights." *Id.* at 466, 629 S.E.2d at 665. "Slander is actionable per se when the defendant's alleged defamatory statements charge the plaintiff with one of five types of acts or characteristics: (1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or

profession." *Goodwin v. Kennedy*, 347 S.C. 30, 36, 552 S.E.2d 319, 322–23 (Ct.App.2001).

Concerning damages, our supreme court has instructed:

General damages include injury to reputation, mental suffering, hurt feelings, emotional distress, and similar types of injuries which are not capable of definite money valuation. Special damages are tangible losses or injuries to the plaintiff's property, business, occupation, or profession in which it is possible to identify a specific amount of money as damages.

*Erickson*, 368 S.C. at 465 n. 6, 629 S.E.2d at 664 n. 6.

As to the first item that McBride claims is defamatory, we believe Roach's allegation that McBride stole school property should go to the jury. McBride presented evidence that the statement was false when a teacher's aide testified that after McBride was dismissed, she took only the items she had purchased with her own funds. Further, the statement was actionable per se because it accused McBride of committing a crime involving moral turpitude. *See Bell v. Bank of Abbeville*, 208 S.C. 490, 496, 38 S.E.2d 641, 644 (1946) (holding that an allegation charging the plaintiff with larceny or breach of trust, crimes involving moral turpitude, was actionable *per se* and did not require an allegation of special damages). Thus, common law malice and general damages are presumed. *See Erickson*, 368 S.C. at 465, 629 S.E.2d at 664. Moreover, there is no question that Roach was responsible for making the statement himself.

Additionally, Roach made the statement to a teacher's aide as she was showing Roach some items McBride had used in her classroom.[5] Both Roach and the teacher's aide were District employees. Therefore, one might conclude that Roach's statement was not published to a "third party,"

---

5. The circuit court ruled that the testimony of the teacher's aide regarding Roach's statement constituted inadmissible hearsay. However, the court did not strike this testimony. Therefore, it is a legitimate part of the record. *See Scott v. Novich*, 300 S.C. 334, 337, 387 S.E.2d 704, 706 (Ct.App.1989) (holding that because counsel made no motion to strike the offending testimony from the record, the trial court did not err in admitting the testimony after sustaining counsel's objection on the ground of irrelevancy).

as is required to prove defamation. However, in South Carolina, an employee's statement to another employee is a "publication" when the privilege of the employees' common interest is abused. *Bell,* 208 S.C. at 493–94, 38 S.E.2d at 643. In *Bell,* our supreme court explained the privilege as follows:

When one has an interest in the subject matter of a communication, and the person (or persons) to whom it is made has a corresponding interest, every communication honestly made, in order to protect such common interest, is privileged by reason of the occasion. *The statement, however, must be such as the occasion warrants, and must be made in good faith to protect the interests of the one who makes it and the persons to whom it is addressed.*

*Id.* at 493–94, 38 S.E.2d at 643 (emphasis added). In sum, communications between employees of an organization are qualifiedly privileged only if made in good faith and in the usual course of business. *Murray,* 344 S.C. at 140–41, 542 S.E.2d at 749.

During oral arguments, the District relied on our Supreme Court's opinion in *Watson v. Wannamaker* for the proposition that a defendant's statement to his secretary does not constitute sufficient publication for purposes of a defamation claim. 216 S.C. 295, 296–99, 57 S.E.2d 477, 477–78 (1950). However, *Watson* is distinguishable from the present case. In *Watson,* the defendant made the statements in question for the purpose of including them in a letter he was dictating to his secretary. 216 S.C. at 296–97, 57 S.E.2d at 477.

In any event, even if the privilege has not been abused, qualified privilege must be raised as an affirmative defense. *See Swinton Creek Nursery v. Edisto Farm Credit, ACA,* 334 S.C. 469, 484, 514 S.E.2d 126, 134 (1999) (classifying qualified privilege as an affirmative defense). Here, the District did not include this defense in its answer; therefore, it may not assert this privilege.

Turning to items 2 and 3, these are vague references to the local newscasts concerning McBride's arrest and are not specific enough to evaluate. In any event, the only statement in the local newscasts that was attributable to a District employee *and* specifically named McBride was the quotation from the superintendent stating his intention to

recommend that McBride be terminated. This statement was a true statement. Therefore, the element of defamation that the statement be "false and defamatory" is missing. *See Fleming,* 350 S.C. at 494, 567 S.E.2d at 860 (requiring a showing that the statement in question is false and defamatory in order to prove defamation).

 Item 4 rests on the assumption that the charges against McBride were, in fact, based on false information. However, assuming, arguendo, that Doe gave false information in his statements, those statements were not the only ones on which investigators relied in seeking warrants for McBride's arrest. McBride's own statement, combined with the statements from some of Doe's teachers, guidance counselors, Chris Boehmke, and Mrs. Boehmke, provide sufficient probable cause for the charges against McBride.[6] *See* S.C.Code Ann. § 16–17–490 (2003) (defining the offense of contributing to the delinquency of a minor); S.C.Code Ann. § 16–17–510 (2003) (prohibiting the enticement of a child enrolled in elementary or secondary school away from required school attendance). Therefore, it cannot be said that the conduct of Roach and Oslager in procuring warrants for McBride's arrest constituted actionable defamation.

In sum, although there was insufficient evidence of the elements of defamation as to items 2, 3, and 4, McBride presented sufficient evidence to support her defamation claim as to item 1—Roach's allegation that she stole school property. Therefore, the circuit court erred in directing a verdict for the District on this cause of action.

## II. *Abuse of Process*

### A. *Immunity*

 McBride asserts that the circuit court erred in concluding that a cause of action for abuse of process is barred by the Tort Claims Act, specifically S.C.Code Ann. § 15–78–60(17) (2005), which states: "The governmental entity is not liable for a loss resulting from . . . employee conduct outside

---

**6.** *See Law v. S.C. Dep't of Corr.,* 368 S.C. 424, 441, 629 S.E.2d 642, 651 (2006) (defining probable cause to make an arrest as "a good faith belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious man, under the circumstances, to believe likewise.").

the scope of his official duties or which constitutes actual *fraud,* actual *malice, intent to harm,* or a crime involving moral turpitude[.]" (emphases added).[7] We agree.

The circuit court specifically concluded that it was "almost impossible" to bring abuse of process and malicious prosecution claims against the state and its political subdivisions "because . . . of the elements of the crime [sic] under the South Carolina [T]ort [C]laims [A]ct." However, a cause of action for abuse of process "contains neither an element of intent to harm, nor actual malice." *Swicegood v. Lott,* 379 S.C. 346, 352, 665 S.E.2d 211, 214 (Ct.App.2008). "The tort of abuse of process consists of two elements: an ulterior purpose, and a willful act in the use of the process that is not proper in the regular conduct of the proceeding." *Id.* at 351–52, 665 S.E.2d at 213.

Based on the foregoing, a cause of action for abuse of process is not barred by section 15–78–60(17) because of its elements. The elements of the tort of malicious prosecution will be discussed later in this opinion.

B. *Merits of claim*

McBride maintains that the circuit court should not have directed a verdict for the District on her abuse of process claim.[8] She argues that there was sufficient evidence of the District's involvement, through Roach, in the decision to arrest her for her claim to go to the jury. We agree.

To successfully maintain an abuse of process claim, the plaintiff must show an ulterior purpose and a willful act in the use of the process that is not proper in the regular conduct of the proceeding. *Swicegood,* 379 S.C. at 351–52, 665 S.E.2d at 213. McBride points to evidence of her bad relationship with Roach and asserts that a jury could infer from this evidence Roach's desire to silence McBride and to ultimately obtain her dismissal from Berea High School. She also points to evi-

---

7. Although the District cited in its answer several additional exceptions to the waiver of immunity under section 15–78–60, counsel raised only subsection 17 in its directed verdict motion and thus the circuit court addressed only that exception.

8. In addition to concluding that the abuse of process claim was barred by the Tort Claims Act, the circuit court concluded that there was no evidence to find that the District instituted any process.

dence of the close relationship between Roach and Oslager, who arrested McBride; Oslager's repeated telephone calls to Roach during his interrogation of Doe; and Doe's testimony indicating that Oslager pressured him to implicate McBride in illegal activity. McBride argues that from this evidence, the jury could infer that Oslager was working in concert with Roach to assist him in accomplishing the purpose of silencing McBride and that they were improperly using the legal process to do so.

We believe that more than one reasonable inference can be drawn from the evidence of telephone calls from Oslager to Roach during his interrogation of Doe. Granted, it is reasonable to assume that Oslager was telling the truth when he testified that he called Roach only to verify certain information Doe provided to him. However, it is equally reasonable to infer from this evidence, combined with Doe's testimony, that Roach provided information to Oslager in an attempt to elicit this information from Doe and use it against McBride. In reviewing the propriety of a directed verdict, neither the trial court nor this court has the authority to decide credibility issues or to resolve conflicts in the evidence. *Parrish,* 376 S.C. at 319, 656 S.E.2d at 388. Therefore, the circuit court should have allowed this cause of action to go to the jury.

### III. *Malicious Prosecution*

#### A. *Immunity*

McBride contends that the circuit court erred in concluding that a cause of action for malicious prosecution is barred by section 15–78–60(17). We agree. The elements of malicious prosecution are (1) the institution or continuation of original judicial proceedings; (2) by or at the instance of the defendant; (3) termination of such proceedings in plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage. *Law,* 368 S.C. at 435, 629 S.E.2d at 648. In this cause of action, malice is "the deliberate intentional doing of a wrongful act without just cause or excuse." *Eaves v. Broad River Elec. Coop., Inc.,* 277 S.C. 475, 479, 289 S.E.2d 414, 416 (1982) (internal quotation omitted). It does not necessarily mean a defendant acted out of spite, revenge, or with a malignant disposition. *Law,* 368 S.C. at 437, 629 S.E.2d at 649.

Malice also may proceed from an ill-regulated mind which is not sufficiently cautious before causing injury to another person. Moreover, malice may be *implied* where the evidence reveals a disregard of the consequences of an injurious act, without reference to any special injury that may be inflicted on another person. Malice also may be *implied* in the doing of an illegal act for one's own gratification or purpose without regard to the rights of others or the injury which may be inflicted on another person. In an action for malicious prosecution, malice may be *inferred* from a lack of probable cause to institute the prosecution.

*Id.* (emphases added).

 Based on the foregoing, one need not show actual malice in order to successfully maintain an action for malicious prosecution. Therefore, the circuit court erred in concluding that a cause of action for malicious prosecution is barred by section 15–78–60(17) because of its elements.

B. *Merits of claim*

 McBride contends that there was sufficient evidence of the elements of malicious prosecution to withstand the District's directed verdict motion. We disagree.

As previously stated, the elements of malicious prosecution are (1) the institution or continuation of original judicial proceedings; (2) by or at the instance of the defendant; (3) termination of such proceedings in plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage. *Law,* 368 S.C. at 435, 629 S.E.2d at 648. Here, McBride has failed to show a lack of probable cause for pursuit of the charges against her.

Probable cause means "the extent of such facts and circumstances as would excite the belief in a reasonable mind acting on the facts within the knowledge of the prosecutor that the person charged was guilty of a crime for which he has been charged, and only those facts and circumstances which were or should have been known to the prosecutor at the time he instituted the prosecution should be considered." In determining the existence of probable cause, the facts must be "regarded from the point of view of the party prosecuting; the question is not what the actual facts were, but what he honestly believed them to be." *South Carolina*

*has long embraced the rule that a true bill of indictment is prima facie evidence of probable cause in an action for malicious prosecution.* Although the question of whether probable cause exists is ordinarily a jury question, it may be decided as a matter of law when the evidence yields but one conclusion.

*Id.* at 436, 629 S.E.2d at 649 (citations omitted) (emphasis added).

In McBride's case, the grand jury's true bill of the indictment against her for contributing to the delinquency of a minor is prima facie evidence of probable cause as to that charge. Further, the information in several witness statements supports a finding that the sheriff's department had probable cause to pursue both the charge for contributing to the delinquency of a minor and the charge for enticing an enrolled child from attendance in school. Therefore, the circuit court properly directed a verdict for the District on McBride's malicious prosecution claim.

IV. *False Imprisonment*

▬ McBride asserts that a directed verdict for the District on her claim for false imprisonment was inappropriate. We disagree.

The essence of the tort of false imprisonment consists of depriving a person of his liberty without lawful justification. To prevail on a claim for false imprisonment, the plaintiff must establish: (1) the defendant restrained the plaintiff, (2) the restraint was intentional, and (3) the restraint was unlawful.

The fundamental issue in determining the lawfulness of an arrest is whether there was probable cause to make the arrest. Probable cause is defined as a good faith belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious man, under the circumstances, to believe likewise. Although the question of whether probable cause exists is ordinarily a jury question, it may be decided as a matter of law when the evidence yields but one conclusion.

*Law,* 368 S.C. at 440–41, 629 S.E.2d at 651 (citations omitted).

Here, McBride has failed to show a lack of probable cause for her arrest. The information in several witness statements

supports a finding that the sheriff's department had probable cause to arrest McBride for the offenses of contributing to the delinquency of a minor and enticing an enrolled child from attendance in school. Further, an assistant solicitor testified that he believed there was probable cause to take the charges to a magistrate for the issuance of an arrest warrant. Based on the foregoing, the circuit court properly directed a verdict for the District on McBride's false imprisonment claim.

In view of our disposition of the foregoing issues, we need not address McBride's remaining arguments. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating that the appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

## CONCLUSION

Accordingly, we affirm the circuit court's directed verdict for the District as to the causes of action for malicious . prosecution and false imprisonment. We reverse the directed verdict as to defamation and abuse of process and remand for a new trial on these causes of action.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

PIEPER, J., and CURETON, A.J., concur.